[Crim. No. 4027. In Bank.—November 10, 1936.]

THE PEOPLE, Respondent, v. NATIVIDAD VALEN-
ZUELA, Appellant.

Harry C. Westover for Appellant.

U. S. Webb, Attorney-General, and Walter L. Bowers, Deputy Attorney-General, for Respondent.

SEAWELL, J.—The appellant, Natividad Valenzuela, was charged by an information filed against him in the county of Orange with having, on May 2, 1936, murdered Jovita Lopez Valenzuela, his wife. He entered the general plea of not guilty and also the plea of not guilty by reason of insanity. The jury returned a verdict of guilty of murder as charged in the information, without recommending life imprisonment, and the issue of insanity having been subsequently determined against him, the court pronounced the sentence of death upon the jury's said verdicts.

His attorney in his opening brief says that he feels that the case was fairly tried and the evidence fairly presented to the jury. The sole question raised by him goes to the issue of intent, or rather to the capacity of the defendant to form a criminal intent. During the trial of the main case appellant's attorney made an offer to prove that the appellant had on several occasions, in bursts of anger and with little or no reason to do so, made violent assaults upon his brother, Narsario, and upon one occasion upon the father,

who interfered in a difficulty between the brothers. These troubles, as related by the father and brother, grew out of disputes touching the control of or the right to an automobile which seemed to have been used by the brothers in accordance with some kind of an understanding between them, or were occasioned by the appellant's irritability as to the method in which the brother Narsario was performing the work in which both were engaged. The appellant was taken into custody by a peace officer, on one occasion, on complaint made by the father as the result of a difficulty in which several members of the family took part, but the complaint seems to have been withdrawn or dismissed. Proof of this class of independent acts, which were in no sense a part of the *res gestae,* was tendered in the main issue of not guilty to show, as appellant puts it, that he was subject to fits or spells during which he suffered a loss of mental poise and self-control. It was not claimed that said temperamental condition rendered him absolutely exempt from punishment, but that it was a proper matter for the jury to consider in determining the question as to whether the defendant should suffer the death penalty or imprisonment in the state penitentiary at the discretion of the jury. (Sec. 190, Pen. Code.) ▮ The above section absolutely delegates the fixing of the penalty for the commission of murder in the first degree to the discretion of the jury trying the case. ▮ The question appellant presents is whether mental weakness or infirmities which do not amount to the kind or degree of insanity or irresponsibility which exempts a person from legal responsibility are proper matters for the consideration of the jury in the exercise of its discretion as to whether the punishment should be death or confinement in a penal institution. Under the decisions of this state, the only test applicable to a determination of legal responsibility for the violation of statutes against crime is: "Did the accused know or understand the nature and quality of the act which he committed, and if so, did he know it was wrong and punishable by law?" If the answer be that he did, he must suffer punishment as prescribed by law, notwithstanding mental abnormalities which do not bear upon the commission of the act. But granting that he is not exempt from punishment by reason of mental deficiencies, is, nevertheless, his mental weakness a proper mat-

ter to be weighed by the jury in the exercise of its discretion as to whether he shall or shall not suffer the death penalty?

█ If the mental state of the accused, as disclosed by the evidence upon trial as to guilty or not guilty, is a matter which the jury may consider in fixing the punishment or degree of the crime, it would seem, under our system, such considerations must be limited to those facts and circumstances relevant to and connected with the commission of the crime charged. Detached or disassociated acts culled from the life of the accused would not be admissible in evidence except on a hearing as to the insanity of the accused. █ All the matters raised on the appeal, and a number of others not referred to, were placed before the jury on defendant's plea of not guilty by reason of insanity, and the jury found against said plea. He testified at considerable length as to both his mental condition at the time he committed the crime and as to the means by which it was committed. The court gave the jury very full instructions as to its right to exercise its discretion and relieve the defendant from the extreme penalty of the law if, in its judgment, the lesser punishment should seem proper in the circumstances of the case presented.

█ It is not to be understood by what we have said herein that we have assumed to limit the power of the jury in the reasonable exercise of its discretion arising out of the facts and circumstances connected with the offense charged. The proper punishment to be imposed is to be determined by the jury after a full consideration of all the evidence adduced at the trial, including that of the defendant, and its discretion which, of course, should not be arbitrarily or captiously exercised, rests wholly within the province of the jury, and when exercised in mitigation of the punshment is not a matter which the court may review.

We will now turn briefly to the commission of the crime. The defendant at the time he committed the offense charged against him was twenty-four years of age and of Mexican ancestry. He was born in this country and spent approximately all of his life near the city of Santa Ana. He had attended American schools and had passed through the grammar grades. His English and his methods of expression are above the average. To the time of his marriage,

he was living with his father's family, which consisted of father, mother, six sisters, himself and a brother. All of the children, it seems, were born in the Delhi district near the city of Santa Ana, where they attended school. The father appears to have been a hard-working man, who in later years received some assistance from his sons in keeping the family together. The deceased, whose maiden name was Jovita Carrillo, was seventeen years of age, born in California, and was educated in the same community as the defendant. The two and their families had been acquainted for a number of years. The defendant and deceased intermarried approximately four months before he killed her. Jovita had not reached her majority and the wedding seems to have been clandestinely performed. After marriage the couple lived for a short time at his father's home, and then took up their domicile a few doors from the home of defendant's father. There is testimony in the record that the defendant on one or two occasions had used physical violence upon his wife and that she refused to return to his home some two or three weeks before her death by reason of mistreatment. She also made some reference to being under age at the time of marriage and suggested the institution of annulment proceedings.

It was claimed that on the occasion above mentioned the defendant made the threat that if his wife, who was then at the parents' home, did not return to his home, he would kill her. She did return on the day she told him she would not live longer with him, but the evidence is to the effect that they frequently quarreled and that on several occasions he used physical force on her. On the day she was killed they had spent the forenoon in Santa Ana. Mr. and Mrs. Guadalupe Lopez were their guests and rode with them into the city, occupying the back seat of the defendant's automobile. While in Santa Ana defendant and his wife visited two furniture stores. The wife was desirous of buying a bedroom set. A ten-dollar deposit was required to make the purchase, and as the defendant had but little change the purchase was not made. He said to his wife that he was going to work the following week and they would make the purchase when he received his pay check. They returned to the Lopez home, stayed a few minutes and re-

turned to their home, having declined an invitation to take dinner with Mr. and Mrs. Lopez as Mrs. Valenzuela was not feeling well. It was understood that the party was to go to a picture show in the defendant's automobile, and the Valenzuelas were to return early in the evening. They did not return. As to what occurred from that time on, we have only the testimony of the defendant. He says that the wife wished to go to a Saturday night dance held at Capistrano. He demurred, as he did not enjoy dancing. She prevailed, and the couple started at about 7 o'clock for the dance. They quarreled on the way, and after traveling for some time along the banks of Peter's canal, a drainage ditch, he turned off this main road and drove down a dirt road, apparently seldom used, halted and protested against going further. He said he had no money. He made contradictory statements as to what happened after he had determined not to go to the dance. In his testimony he said that his wife said she was going to walk home and started to get out of the car, and that he went around to the front door and after some struggling pulled her out. At another time he said that she jumped out; that he was struggling with her and that she scratched and kicked him; that the rear door of the car hung open and he reached in and took from the floor the auto jack and struck her three blows on the face and head. She never spoke while he was striking her. The blows crushed in the frontal bones of the face, and the cranial wounds were of such a depth that death was certain to ensue within a short time after they were inflicted. The car was stopped near the banks of said ditch, which was nine feet deep and contained a few inches of water. Its banks and sides were covered with a growth of weeds. He rolled her body to the brink of the precipitous side of the ditch and it went to the bottom of its own momentum. He threw the blood-stained jack into the ditch, where it sunk in the mud, covering all but a few inches of its length. The body was discovered one week afterwards by two boys, Vernon and Bobby Calvin, who happened to pass that way while enjoying a Saturday outing. After the murder the defendant drove to his father's home and later in the afternoon had his brother drive him to Riverside, where he intended to board a freight train.

Not able to do so, he walked to Colton, and from this point made his way by freight train and automobile to Texas, where he remained a few days and then returned to Santa Ana by the same methods of transportation which he employed on leaving. He was arrested while walking into Santa Ana on the railroad track. At first he denied his identity and gave a false name. Soon after his arrest he disclosed his identity and made several statements, but did not in any of them relate any circumstances which would tend to justify or mitigate his shocking assault and ruthless treatment of his wife's body, except to say that he became so angry, in the circumstances of the situation, that he lost his self-control and was no longer master of his perverse passions.

On the trial of the issue of not guilty by reason of insanity it developed that an aunt on the paternal side and an aunt on the maternal side of defendant had been afflicted with insanity. It was also claimed that the defendant had impaired his mind by smoking marijuana cigarettes for a period of time prior to his marriage. In fact, in a belated statement as a witness, he testified that he smoked such a cigarette on the day he committed the crime. There is no substantial evidence in the record to the effect that either the use of intoxicating liquor or the effects of any drug used by him had impaired his mind to the extent that he was not conscious of the act which he committed. In fact, there is no evidence to justify the claim that he was, or ever had been, excessively addicted to the use of either. The two alienists appointed by the court to examine the defendant and investigate his sanity, Dr. Edwin Wayte, superintendent of the Norwalk State Hospital, and Dr. Aaron J. Rosanoff, a specialist in nervous and mental diseases, testified that in their opinion the defendant was responsible for his acts as tested by the rule heretofore announced, both at the time of trial and at the time he committed the crime charged against him. Dr. Rosanoff thought that the defendant exhibited a serious temperamental abnormality which may have been inherited. He was of the opinion, however, that he was able to distinguish right from wrong.

We have examined the entire record, but do not find that any prejudicial errors were committed against the defend-

ant. The evidence being sufficient to sustain the judgment and the orders, we are not at liberty to disturb it.

The judgment and orders appealed from are affirmed.

Curtis, J., Langdon, J., Edmonds, J., *pro tem.*, Shenk, J., Thompson, J., and Waste, C. J., concurred.