[Crim. No. 4402.   In Bank.   May 28, 1942.]

THE PEOPLE, Respondent, v. JOHN LAWRENCE COLEMAN, Appellant.

Arthur B. Dunne and Dunne & Dunne for Appellant.

Earl Warren, Attorney General, and Frank Richards, Deputy Attorney General, for Respondent.

SHENK, J.—This is an automatic appeal from a judgment of conviction of first degree murder imposing the death penalty on the defendant. (See § 1239 Penal Code).

The defendant killed his wife, Myrtle May Coleman, in San Diego county, on June 5, 1941, by shooting her with a

.38 caliber revolver. He was immediately taken into custody and was charged with the commission of the offense. On his arraignment he pleaded not guilty and not guilty by reason of insanity. In conformity with the provisions of section 1026 of the Penal Code he was tried first on his plea of not guilty. The jury brought in a verdict of guilty as charged without recommendation. The defendant thereupon went to trial before the same jury on his plea of not guilty by reason of insanity. The jury found that he was sane at the time of the commission of the crime. The imposition of the death penalty followed.

At the trial the defendant was represented successively by two attorneys appointed by the court. At the close of the trial he expressed dissatisfaction with the second attorney for the reason that said attorney was of the opinion that the defendant had no grounds for a new trial. The court permitted the defendant personally to argue the motion for a new trial. The motion was denied. On the appeal counsel was appointed by the court to prepare briefs in behalf of the defendant. Those briefs have been filed. They present fully and ably the arguments in support of all points in the defendant's behalf. In addition the defendant himself has submitted certain matters occurring in the course of the trial which are claimed by him to justify a new trial.

None of the matters presented by the defendant in his own behalf is germane to any possible ground for a new trial. Neither are they relevant to the question whether he has had a full, fair and impartial trial. No prejudice to him may be inferred because the jury consisted of ten women and two men, and one woman alternate. Other matters urged by him in person do not require special notice.

The facts disclosed on the trial of the issue of not guilty are undisputed.

The defendant was born in Chicago, and at the time of trial was forty-nine years of age. He had been previously married and was the father of two sons. The deceased was his third wife. He was in the United States Army on the Mexican border in 1915. He served on the Chicago police force for about six years. For eighteen years he was occupied as a bartender and as an automobile salesman. He gambled and drank heavily. About a year and a half before the homicide he was treated in a hospital for delirium tremens.

In May 1935 the defendant came to San Diego. He was

working as a bartender at the San Diego Fair when he met the deceased. They married in November 1937. During this period the defendant was unemployed a large part of the time. The deceased objected to his working as a bartender. They bought a ranch on which the defendant worked for a year and a half. It proved unprofitable. They disposed of it and took up their residence again in the city of San Diego. The deceased operated a beauty shop, known as ''Peggy's Beauty Salon'' in Coronado near the Hotel Del Coronado. She, too, had previously been married. In 1935 the defendant loaned her $500 to assist her in obtaining a divorce from her husband. In 1936 he loaned her the further sum of $300 to assist her in the operation of her business. Other money matters between them grew out of the deceased's pawning two diamond rings belonging to the defendant, and the payment by her of a balance for his hospital treatments.

In March 1941 the spouses separated and the wife contemplated divorce proceedings. She and the defendant signed an instrument prepared by the wife, whereby she agreed to pay the defendant $200 in settlement of all claims. She paid him $175 at the time and signed a thirty-day note for the balance. She orally promised to pay him $150 in small amounts as he needed it from money which she was holding for him. The defendant signed a general appearance in the divorce action and the interlocutory decree was entered on April 25, 1941. He thereupon went to Texas and to his home in Chicago where he recovered from an illness. He returned to San Diego on the night of May 22, 1941 and called up his wife. There was no answer. He went to her residence and waited until about midnight when she drove to her garage in a new car. The defendant accosted her and she screamed. The defendant left the scene and later called her on the telephone. He insisted that she meet him downtown at a designated waffle shop. She met him accompanied by a police officer who took him into custody on a battery charge. He pleaded guilty and on May 29th received a suspended sentence. On that day he talked to Mrs. Coleman and told her that he was going to Long Beach to look for work and he wanted the pawn tickets for his rings and some of the money which she still owed him. She promised to get the rings out of pawn when she had sufficient money for the purpose, and to send him what she could spare on the following Saturday if he did not locate a job. She exacted a promise on his part

that if he came back he would not come to Coronado or cause her any trouble.

At Long Beach the defendant sought employment without success. While he was there he was drinking heavily and ran short of funds. He traded some personal effects at one place for the .38 caliber revolver and at another place purchased twelve cartridges. On June 5, 1941, he boarded a bus bound for San Diego. He carried the revolver in a hand bag. He also had a bottle of whiskey in his pocket. While he was drinking liquor in the Laguna Beach bus station the bus left without him. He then made the rounds of the Laguna Beach drinking places. He testified that he remembered nothing after an argument with a Laguna Beach bartender over a twenty-five cent charge for a bottle of beer until he awoke after dark to find himself in the Coronado jail on a charge of murdering his wife.

The defendant's purpose in going to San Diego was to get the money owing to him from his wife. He arrived in San Diego about 4:30 on the afternoon of June 5th. He entered a yellow cab with his travelling bag and requested the driver to take him to the Hotel Coronado. The driver did not know the route to the hotel and the defendant directed him. When they arrived at the hotel grounds, the defendant asked the driver to proceed to the rear of the grounds. There the defendant paid the driver and dismissed him. The defendant crossed shrubbery, a fence and the road back of the hotel. His bag was found the next day in that part of the grounds. The defendant next appeared in "Peggy's Beauty Salon." He asked where Peggy was. He was told she was in a rear booth having her hair combed. He entered the booth. Mrs. Coleman turned and said, "you have been drinking." The attendant saw the muzzle of the gun extending from the defendant's coat pocket in his right hand. She ran to the hotel. Mrs. Coleman was left alone in the booth with the defendant. Three or four shots and a woman's scream were heard. Mrs. Coleman made her way to an alley back of the beauty shop. The defendant followed her and began hitting her with the barrel of the gun. A beauty shop attendant opened the door of a real estate office and Mrs. Coleman stepped through the doorway. The defendant followed and hit her again. She collapsed, and he leaned over her. Someone straightened him up, and he threw the gun under a desk. He said: "She got what was coming to her." The defendant made no attempt

to get away but stood slouched against a wall. Within five minutes an officer appeared and took him in custody. As he was being driven away he pointed to Frank Martin, proprietor of a nearby barber shop, and said, ''you are the next.''

Mrs. Coleman was taken to a hospital where she died. Her body showed four bullet wounds, two in the arm, one in the abdomen, and one in the back.

At the police station the defendant was examined by a physician and found to be untidy, unshaven, his speech coherent, but he showed the influence of alcohol in his eyes, tongue, and throat, and in his walk. He stated to an officer that he had shot his wife; that he had been drinking for three days; that he intended to kill Frank Martin, the barber, first, and then his wife, but that it did not work out as he had planned.

On the trial of the issue of insanity the following appeared: The defendant was born in 1892. His academic education ceased when he was in the seventh grade. He left home at the age of sixteen or seventeen, and took up the occupation of bartender. He had had the usual children's diseases, and in addition sustained a head injury by being hit by a ''two by four,'' which rendered him unconscious. At another time he was beaten by a gang and thrown into a basement. In one affray while he was a policeman he was stabbed in four places. The scars of those injuries were visible.

The defendant started to drink at the age of seventeen and became a heavy drinker. He had delirium tremens the first time in 1924 or 1925 and about six times in the ten-year period prior to 1940. He noticed that after treatment for this difficulty his memory was not different or affected but that instead of being cured he became progressively worse.

His relations with the deceased were happy up to the time of their separation. On the trial of the insanity plea he related the cause of separation. He and the deceased had lived together for a year and a half before their marriage in 1937. About October, 1940, he appeared unexpectedly in the beauty shop just before closing time. Frank Martin, the barber, came in shortly thereafter. Due to the fact that his wife had permitted the operators to leave earlier than usual, and because of the apparent embarrassment of Martin and Mrs. Coleman, the defendant suspected her infidelity. His suspicions increased when she daily made excuses for delaying her departure from the shop beyond the customary closing

time. He watched her for some time without gaining any tangible evidence. Finally she confessed her relations with Martin and they agreed upon the divorce and settlement.

The defendant testified fully regarding past illnesses, injuries, and events in his life, also that there were insanities and suicides in his family. The physical and psychological effects of his drinking, his divorce and separation were also given in detail. The jury heard testimony of doctors who examined him and who gave their opinion, on the one side that he was insane, and on the other that he was sane at the time of the homicide.

The defendant does not contend that the evidence was insufficient to sustain the finding of the jury that he committed the homicide. He does not and indeed could not seriously contend that the evidence of his mental condition was such that he should be relieved of responsibility for his criminal act. ■■■ His principal contention is that the jury should have had before it on the trial of the issue of not guilty the testimony on the insanity issue; that otherwise it could not determine with justice to him the degree of the crime or the punishment which should be meted out to him. It is his theory that in following the procedure required by section 1026 of the Penal Code the punishment should not be fixed by the jury until after the insanity hearings; that the jury should have before it all the testimony which might bear on the matter of the exercise of the jury's discretion to return a recommendation of life imprisonment with the verdict of guilty of murder in the first degree. He points out that in cases where the defendant enters the sole plea of not guilty by reason of insanity the trial court fixes the punishment after the evidence relating to the issue of insanity has been received. It is argued that on the trial of the plea of not guilty the instruction that the defendant is, for the purposes of that plea, conclusively presumed to be sane eliminates any consideration of mental abnormalities not amounting to a complete defense of legal insanity, but which still may show the lack of capacity to form the specific intent to commit first degree murder; and that the jury should be permitted on that plea to consider all of the evidence bearing on the mental condition of the defendant at the time of the commission of the crime.

The foregoing contentions are not new. They were made in other cases determined after the amendment of sections

1016 and 1020 of the Penal Code and the enactment of section 1026 of the same code all in 1927. It may not properly be contended that the procedure prescribed by those sections was not followed in the present case. Those enactments were incorporated in the law of this state for the obvious purpose of providing a remedy against what was deemed to be a grave defect in the administration of the criminal law when the question of the insanity of the defendant was injected into the case. They were declared to be valid in 1928 in the case of *People* v. *Troche*, 206 Cal. 35 [273 Pac. 767], and have been upheld in a line of unvarying decisions for the last thirteen years and more, some of which are the following: *People* v. *Leong Fook*, 206 Cal. 64 [273 Pac. 779]; *People* v. *Valenzuela*, 7 Cal. (2d) 650 [62 P. (2d) 142]; *People* v. *Boggs*, 12 Cal. (2d) 27 [82 P. (2d) 368]; *People* v. *French*, 12 Cal. (2d) 720 [87 P. (2d) 1014]; *People* v. *D'Angelo*, 13 Cal. (2d) 203 [88 P. (2d) 708]; *People* v. *Cordova*, 14 Cal. (2d) 308 [94 P. (2d) 40]; *People* v. *Smith*, 14 Cal. (2d) 541 [95 P. (2d) 453].

In the intervening years the Legislature has not seen fit to change those laws in any substantial respect, and not at all in the respects of which the defendant in this case now complains.

The arguments for the defendant derive their encouragement from certain dissenting opinions, first in *People* v. *Troche, supra,* which set forth the views advanced by the defendent herein. Fundamentally the opposing views expressed in the decided cases are addressed to the desirability of the legislative policy, rather than to the question of deprivation of constitutional rights under the established system. As stated in *People* v. *Perry*, 195 Cal. 623 [234 Pac. 890], the standard of accountability is the nature and quality of the act and not the mental age of an adult criminal. The contention was rejected that degrees of mental irresponsibility induced by injury, drugs, or disease, short of legal insanity, should be considered as mitigating circumstances. It was held that the exercise of the jury's discretion was confined to a consideration of the facts and circumstances attending the commission of the crime, and after such consideration if any doubt be engendered as to the punishment to be imposed, the jury should not impose the extreme penalty.

In *People* v. *Hickman*, 204 Cal. 470 [268 Pac. 909, 270 Pac. 1117], it was determined that the 1927 amendments to

the Penal Code requiring a separate hearing on each plea did not take any constitutional rights from the defendant who pleaded not guilty and not guilty by reason of insanity. It was pointed out that the purpose of the statute was to overcome some of the abuses which had crept into the administration of justice in criminal cases and that, under proper pleas, the defendant may submit all the evidence which could have been presented before the effective date of the amendments in mitigation of, excuse, justification or exoneration for the act; likewise that the amended statute did not take away the defense of insanity, nor did the change in procedure in any way change or affect the rule concerning the burden of proof. (See also *People* v. *D'Angelo, supra.*)

In *People* v. *French, supra,* this court quoted with approval the general rule "that insanity . . . is either a complete defense or none at all, and . . . there is no degree of insanity sufficient to acquit of murder but not of manslaughter." It was said: "The insanity of a defendant cannot be used for the purpose of reducing his crime from murder in the first degree to murder in the second degree. If responsible at all in this respect, he is responsible in the same degree as a sane man, and if he is not responsible at all he is entitled to an acquittal on both degrees." Obviously an insane person accused of a crime would be inhumanely dealt with if his insanity were considered merely to reduce the degree of his crime or the punishment therefor. In the Troche case it was also pointed out that whether the issue of guilt or the issue of insanity should be tried first was a matter to be determined by the Legislature in the absence of any constitutional prohibition. That case was followed in *People* v. *Leong Fook, supra,* where it was observed that the intent with which the homicide was committed must be manifested by the circumstances connected with the offense, and that evidence relating to the character and previous habits of the defendant was not admissible solely for the purpose of enabling the jury to assess the punishment at death or life imprisonment; that the proof of insanity in the nature of things was separable from the facts and circumstances attending the commission of the homicide and such as existed antecedently to the commission of the homicide and disconnected with the facts and circumstances which immediately precede, attend and follow its commission.

In *People* v. *Valenzuela, supra,* the defendant was sentenced to pay the extreme penalty after adverse verdicts of the jury on pleas of not guilty and not guilty by reason of insanity. In that case, as here, the question was presented whether mental weaknesses or infirmities, not amounting to the insanity or irresponsibility which would be a complete exoneration, were proper matters for the consideration of the jury in determining whether punishment should be life imprisonment or death. A unanimous court concluded that detached or dissociated acts culled from the life of the accused were not admissible in evidence except on the hearing on the issue of insanity. The same contention was made in *People* v. *French, supra,* and rejected on the authority of *People* v. *Troche, supra,* and other cases. There the nature of the abuse sought to be corrected by the 1927 amendments was more fully stated at page 740 in the following language: "Under the general plea of not guilty, prior to the amendments of the statute, evidence relevant to the issue bearing upon mental competency but which had no relevancy to the issue of not guilty, was presented to the jury under the plea of not guilty and there is reason to believe that in many cases evidence as to mental competency in its almost illimitable field of exploitation had the effect of over-exciting the emotions of jurors by the introduction of matters not relevant to the question of guilt, to the extent of mitigating punishment in cases where it was not merited. Under the former system two issues were submitted in a single action. The intermingling of these issues provable by different degrees of proof may have caused some confusion in the minds of the jury. To remove such a possibility, as well as to prevent the jury from being influenced by matters which were solely relevant to the issue of insanity, may have constituted considerations which account in a measure for the changes made in the statute." In that case the opinion was expressed that a plea to reduce the punishment from death to life imprisonment was one to be relegated exclusively to the field of executive clemency, and that the judicial modification authorized by statute did not comprehend the power to reduce the penalty for first degree murder from death to life imprisonment. When, therefore, in the exercise of its discretion, the jury has seen fit to impose the extreme penalty, its determination cannot be disturbed by the reviewing court. (See *People* v. *Valenzuela, supra,* p. 653; *People* v.

*Martin,* 12 Cal. (2d) 466, 471 [85 P. (2d) 880]; *People* v. *Hall,* 199 Cal. 451, 456-457 [249 Pac. 859].)

In *People* v. *Cordova, supra,* it was said that it was immaterial at what point the insanity hearing was held, because the evidence received thereon could be considered for proper purposes only and could not be used to measure the severity of the punishment to be imposed. In that case the defendant urged the contention here made, that the variation in procedural steps in the case where both pleas were entered, and the case where the defendant pleaded only not guilty by reason of insanity, created an unjust and unreasonable discrimination in favor of the defendant in the latter case. The contention was rejected on the ground that in neither case could the evidence on the plea of insanity be taken into consideration in determining the degree of the crime or the punishment, and that it was not reasonably to be supposed that a court, in determining the punishment after the insanity hearing, would base its decision on factors not properly before it for the purpose, but that it would be presumed to have wisely exercised the discretion conferred upon it.

■ Where evidence of intoxication was presented to the jury and under appropriate instructions the jury was permitted to consider the evidence for the purpose of determining whether the defendant had the intent to commit the crime charged, the verdict and judgment will not be disturbed if the facts are sufficient to support the implied finding that the defendant had the specific intent (*People* v. *Boggs, supra; People* v. *Smith, supra*), and if there is substantial and credible evidence on the insanity hearing to support the verdict of sanity. (*People* v. *Greig,* 14 Cal. (2d) 548 [95 P. (2d) 936].)

■ On the trial of the plea of not guilty in the present case the jury was properly instructed on the issue of intent. On the trial of the plea of not guilty by reason of insanity, it was properly instructed as to the test of legal insanity, namely, whether the defendant had reasoning capacity sufficient to distinguish between right and wrong concerning the particular act he was doing—knowledge and consciousness that what he was doing was wrong and would subject him to punishment. (*People* v. *Troche, supra,* at p. 46; *People* v. *Kimball,* 5 Cal. (2d) 608, 610 [55 P. (2d) 483]; *People* v. *Valenzuela, supra,* at p. 652; *People* v. *French, supra,* at p. 730.) ■ There is here an abundance of credible evi-

dence to support the verdicts of the jury. Even if the jury believed the defendant's testimony that he had no recollection of what transpired after he left Laguna Beach until he awoke in the Coronado jail, there is sufficient in the record to justify the implied finding of the jury that the defendant formed the specific intent before he commenced the trip to San Diego, and that such intent continued to control his act. (*People* v. *Norwood,* 39 Cal. App. (2d) 503, 505 [103 P. (2d) 618].) ▮ It may be noted without further discussion that there was sufficient evidence on the insanity hearing to support the implied finding of the jury that the prolonged habitual drinking of the defendant and the effects thereof did not result in his insanity.

The record discloses that the defendant has had a full and fair trial. The court received evidence of all facts and circumstances which the defendant offered to show lack of specific intent and to mitigate the punishment, and correctly instructed the jury that it could consider such evidence for the appropriate purposes.

We find no error or prejudice to the defendant's substantial rights by reason of any of the instructions given or because of the conduct of the trial in separate hearings on the pleas entered by the defendant.

The judgment and the order denying the motion for a new trial are affirmed.

Gibson, C. J., Curtis, J., Edmonds, J., Carter, J., and Traynor, J., concurred.