[Crim. No. 6409. In Bank. Aug. 28, 1959.]

THE PEOPLE, Respondent, v. JIMMIE LEE JONES and PHILLIP HENRY HAMILTON, Appellants.

Fred Okrand, under appointment by the Supreme Court, Ralph R. Rubin and Maurice H. Hardeman for Appellants.

Stanley Mosk, Attorney General, Clarence A. Linn, Chief Assistant Attorney General, and John S. McInerny, Deputy Attorney General, for Respondent.

PETERS, J.—Defendants pleaded guilty to murder in the first degree, waived a jury trial on the issue of punishment, and, after a five-day hearing on that issue, were sentenced to death. The appeals are automatic. (Pen. Code, § 1239, subd. (b).)

On April 6, 1958, Ruth Swanson Rivers, a woman of advanced middle age, was found dead on her bed in her apartment on Geary Street in San Francisco. The body was nearly nude and had a knotted rag around and embedded in its neck. In the opinion of the autopsy surgeon and the chief pathologist of the coroner's department, the cause of death was strangulation effected by force. The autopsy also revealed that there were spermatozoa in the victim's vaginal area. The victim's empty coin purse was found on the floor beside her bed.

Defendants Jones and Hamilton were arrested on April 9, 1958. At first they denied any connection with the crime, but finally each confessed to the robbery of Mrs. Rivers. Jones, in his statement to the police, admitted both raping and robbing the victim, but he insisted that at the time he left the apartment Mrs. Rivers was still alive. Hamilton also admitted to the police that he had robbed Mrs. Rivers. He denied that he had raped her, and insisted that she was alive when the two men left the apartment. Jones also declared that Hamilton entered the apartment first, grabbed Mrs.

Rivers, and was choking her with a rag around her throat when he, Jones, entered.

The amended indictment, among other things, charged Jones and Hamilton with the murder of Ruth Swanson Rivers. To this charge the defendants pleaded guilty, and specifically pleaded guilty to first degree murder. Before the plea was taken, the trial judge told the defendants that there had been no promise on his part, nor would he make any promise, as to the penalty that he would impose. ''I want each of you to understand that the Court did not indicate in any way what the penalty would be should it be left up to the Court. Nor did the Court make any promise. There was just a general discussion.

''If your counsel inferred anything from that, or communicated that to you, I want you to know that it is their own inference and the Court does not intend to be bound by anything that your counsel might have inferred. I will judge the case on the evidence presented to me on the question of penalty and make my decision.

''I have no preconceived ideas as to what it would be at this time. I will have to wait until I hear all of the charges, that is, hear the evidence presented. So, if any representation was made to you that you are likely to get life imprisonment instead of death, I want you to know that I don't feel they have been warranted by the conversation that was held here.''

Upon being arraigned on the amended complaint the clerk first asked Jones ''what is your plea to Count 1, to wit: the crime of murder in the first degree?'' Before the question was answered, the court stated: ''Now, Jimmy Lee Jones, before you enter your plea to that charge, I want to ask you: You have talked this over with your counsel, have you? Defendant Jones: Yes. The Court: And with your parents and relatives, and you have had ample time to consider this? Defendant Jones: Yes. The Court: And you are ready at this time to enter your plea? Defendant Jones: (Nodding affirmatively.) The Court: And your plea is a voluntary one on your part? Defendant Jones: Yes. The Court: And not induced by any promise as to what the penalty might or might not be? Defendant Jones: No. . . . The Clerk: What is your plea to Count 1, to-wit: the crime of felony, violation of Section 187 of the Penal Code, murder in the first degree? Defendant Jones: Guilty.''

Essentially the same procedure was followed with the de-

fendant Hamilton, except that he entered his plea before the judge had a chance to ask the questions. The judge, however, before he would accept the plea, inquired as to whether it was voluntary, whether it had been well-considered with counsel and family, and whether or not it had been induced by any promise of a lighter punishment.

Defendants then waived a jury trial on the question of penalty. Counsel for each defendant first requested the waiver and then the trial court asked each defendant personally if he waived a jury trial. Each responded affirmatively.

The trial court next proceeded to try the penalty issue. The hearing lasted for five days.

This procedure was correct.

Section 190.1 was added to the Penal Code in 1957. (Stats. 1957, p. 3509, chap. 1968, § 2.) Where the death penalty is possibly involved it provides for a separate trial of the guilt issue and of the penalty issue. The section provides, in part: "If the defendant was convicted by a plea of guilty, the *trier of fact* shall be a jury *unless a jury is waived.*" (Emphasis added.) The first portion of the section reads: "The guilt or innocence of every person charged with an offense for which the penalty is in the alternative death or imprisonment for life shall first be determined, without a finding as to penalty. If such person has been found guilty of an offense punishable by life imprisonment or death, there shall thereupon be further proceedings on the issue of penalty, and the *trier of fact* shall fix the penalty. Evidence may be presented at the further proceedings on the issue of penalty, of the circumstances surrounding the crime, of the defendant's background and history, and of any facts in aggravation or mitigation of the penalty." (Emphasis added.) (See *People* v. *Glatman, ante,* pp. 283, 286 [340 P.2d 8].)

The law also requires (Pen. Code, § 1192) that, upon a general plea of guilty to an offense divided into degrees, the trial court must fix the degree of the crime. Under the former procedure in a case involving murder, the court would take evidence concerning the degree of the crime, and also to determine by such evidence what the penalty was to be. "It [the degree of the offense] is a matter, together with the penalty to be imposed, which must be determined by the court on competent evidence before passing sentence under a plea of 'guilty' (Pen. Code, § 1192) . . ." (*People* v. *Mendez,* 27 Cal.2d 20, 23-24 [161 P.2d 929].) Thus, under former practice, defendant did not have a right to a trial by jury on the

issue of the degree and penalty after a plea of guilty. This procedure was held constitutional. (*People* v. *Hough,* 26 Cal.2d 618 [160 P.2d 549], *cert. dismissed,* 326 U.S. 691 [66 S.Ct. 232, 90 L.Ed. 407].) Now, under the 1957 provision (Pen. Code, § 190.1) the defendant does have a right to a jury hearing on the issue of penalty, but by the section the right may be waived, as was done in the instant case.

The procedure to be followed in fixing the degree of the crime need not be here determined because in the instant case both defendants expressly pleaded guilty to the crime of murder in the first degree. Under the old law, even in such a case, the trial court was required to fix the degree of the offense after a plea of guilty. (*People* v. *Paraskevopolis,* 42 Cal.App. 325 [183 P. 585].) But, under the new law, the trial court is apparently empowered to accept a plea of guilty to a particular degree of an offense.

Section 1192.1 of the Penal Code, added in 1955, and amended in 1957, provides: "Upon a plea of guilty to an information or indictment accusing the defendant of a crime divided into degrees when consented to by the prosecuting attorney in open court and approved by the court, such plea may specify the degree thereof and in such event the defendant cannot be punished for a higher degree of the crime than the degree specified."

In the instant case the defendants pleaded guilty to the offense of murder in the first degree. These pleas were accepted by the prosecuting attorney and the trial judge. Therefore the only issue to be determined at the hearing was which penalty was to be imposed, that is, life imprisonment or death. But, even though not required to do so, at the close of the penalty hearing, the trial court determined that the murder was of the first degree. Thus, there was no error in the procedure followed by the court in fixing the penalty.

 Defendants were originally indicted on 17 counts: one count of murder, four counts of burglary, four counts of robbery, and eight counts of rape. In a conference before the trial court with the defendants present, the district attorney and defendants' counsel stipulated that if the defendants pleaded guilty to the charge of murder, the other 16 counts of robbery, rape and burglary would be dismissed. The prosecuting attorney then stated his position as follows:

". . . if each of the defendants pleads guilty to first-degree murder, that is, Count 1 of the amended indictment . . . the District Attorney's Office will move to dismiss each of the

remaining counts of the amended indictment and also the two other indictments that are now pending before this Court for trial. However, the District Attorney's Office has given no assurance of any kind as to its—that it will in any way move or seek to lessen the penalty, but instead indicates very clearly now that it is the position of the Office that this is a capital case and that the extreme penalty should be inflicted. Mr. Rubin [Defendant Jones' then counsel] : We understand, yes. Mr. Elkington : We also, if the defendants plead to first-degree murder, then on the question of penalty we propose to introduce evidence, not only with regard to Count 1, the circumstances of Count 1 of the amended indictment, but also evidence as to the remaining counts of the amended indictment and two other indictments which have been dismissed in support of our motion that the extreme penalty should be inflicted. Mr. Rubin : I understand. Mr. Hardeman [Defendant Hamilton's counsel] : Yes.'' This understanding was carefully explained to the defendants personally by the trial judge. The defendants thereupon pleaded guilty in the manner stated, formally withdrew their pleas of not guilty and not guilty by reason of insanity which had been entered under former indictments, and reasserted their pleas of guilty to the amended indictment "for the record." Then, the prosecuting attorney's motion to dismiss Counts 2-17 (rape, robbery, and burglary) was granted without objection.

At the penalty hearing, evidence of the murder of Mrs. Rivers was introduced. Formal statements made by the defendants to the police connecting them with the crime charged were also introduced. Then the prosecution introduced evidence of other rapes and robberies with which the defendants had been charged. Alberta Bell, a 71-year-old woman, testified that she had been raped on the roof of her apartment house on February 6, 1958. The attempt at robbery failed because Mrs. Bell had no money. Mrs. Bell positively identified defendant Hamilton as the assailant. Hamilton denied to police that he had committed this crime and his counsel attempted to establish an alibi by showing that he had been at work. However, Hamilton, as a witness testifying on his own behalf, failed to deny his guilt with respect to the Bell incident.

Mrs. Henren Adell testified that on the evening of February 25, 1958, the defendants seized her as she entered the elevator in her apartment. Defendants took her to the roof top where they raped her. Hamilton searched her purse,

took the small amount that was in it, and, upon discovering a Bible and various church papers, apologized to her, stating that he did not know she was a church lady. Hamilton denied that he had raped her, but admitted robbing her.

Mrs. Mabel Olive Johnson testified that on the morning of March 7, 1958, the defendant Jones came to her apartment, where she was manager, and requested to be shown an apartment. As she was showing him the apartment, Jones placed a cloth around her neck and began choking her, and then threw her down and raped her.

Mrs. Cornelia Prince Chase, a 72-year-old woman, testified that on March 11, 1958, a Negro man entered her small shop on Steiner Street in San Francisco. He first inquired as to a piece of driftwood on sale in the shop, and then threatened her with a razor. She was forced into the back room of the shop where the man raped her. She could not identify the man, but the man stole a Grundig radio from the store which was subsequently found in Jones' apartment. Defendant Jones admitted to the police that he had raped and robbed this witness.

Ruth Johnson testified that on the afternoon of March 20, 1958, she was assaulted by two colored men who were waiting for her in her apartment. The men raped her and did other "awful things." The witness was unable to identify the two men. However, the witness had been selling Avon Cosmetics. Some Avon Cosmetics were subsequently found in the rooms of the defendants.

Mrs. Oma Fleming testified that on the morning of March 30, 1958, defendant Jones asked to be shown an apartment in the apartment house she managed. After he had agreed to rent an apartment, the witness took Jones to her apartment in order that she might fill out a receipt for the deposit. While there, the defendant threw a cloth around her neck, threw her on the bed, gagged and blindfolded her, raped her, and robbed her. He also threatened to kill her if she reported the matter to the police.

Several days after the murder of Mrs. Rivers, Mrs. Cleo Billups testified that on April 8, 1958, she was attacked by defendants while riding in the elevator of her apartment. The two men seized her in the elevator on the first floor. On the way up the elevator stopped at about the eighth floor where a woman was waiting to get on. Hamilton told this woman that she was not to worry because he was just taking his wife home. Defendants took the witness then to the top floor where they

raped and robbed her. Upon leaving, one of the defendants stated she could go; the other stated "no, she got too good a look at my face." The first then stated that it did not make any difference because she was too frightened to do anything about it anyway.

Hamilton, in statements to the police admitted assaulting and robbing Cleo Billups, Ruth Johnson, and Henren Adell, but denied raping any of them.

On the stand Hamilton testified that he and Jones decided to rob someone in the apartment house of Mrs. Rivers. He stated that he decided to use the "telegram gag," whereby one of the defendants would ring a doorbell of an apartment and, upon the woman's responding, would announce that they had a telegram or special delivery letter for her. They would tell her that she could not have it until she gave some identification, and when she turned around to get some identification, they would grab her. This procedure was followed with Mrs. Rivers. Hamilton testified, however, that he did not choke, strike or rape her. Hamilton's statements on the stand were in conflict to Jones' statements to the police. Jones told the police that both he and Hamilton had raped Mrs. Rivers, and that Hamilton had a rag around her neck when he (Jones) entered the apartment. Both Jones and Hamilton insisted that Mrs. Rivers was alive when they left the apartment.

Jones contends that the trial court erred in admitting evidence of the other rapes, robberies, and burglaries. This argument is without merit. Both defendants and their counsel were told by the prosecuting attorney that at the penalty hearing he would offer this evidence, and the trial judge, before accepting the guilty pleas, told the defendants and their counsel that such evidence was to be offered and would be admitted by him. Defendants and their counsel agreed to this procedure.

It should also be mentioned that no objection was made at the trial to this evidence. Such failure precludes objection on appeal to the admission of such evidence. (*People v. Feldkamp*, 51 Cal.2d 237 [331 P.2d 632].)

The cases relied upon by Jones do not compel nor suggest that the evidence involved was not admissible. They are all cases decided prior to the adoption of section 190.1 of the Penal Code providing for separate trials of the guilt and penalty issues. Those cases hold that evidence not relating to the circumstances of the crime charged may not be intro-

duced on the trial even though such evidence might be relevant on the issue of the penalty. (*People* v. *Witt*, 170 Cal. 104, 110 [148 P. 928]; *People* v. *Valenzuela*, 7 Cal.2d 650, 653 [62 P.2d 142]; *People* v. *Troche*, 206 Cal. 35, 47 [273 P. 767]; *People* v. *Luis*, 158 Cal. 185, 194 [110 P. 580].) But, since the adoption of section 190.1 of the Penal Code in 1957, providing for separate trials of the guilt and penalty issues, the reason for the rule announced in those cases no longer exists. The section expressly provides: ''Evidence may be presented at the further proceedings on the issue of penalty, of the circumstances surrounding the crime, of the defendant's background and history, and of any facts in aggravation or mitigation of the penalty.''

 It would appear that the new section embodies the broad, liberal rule on admission of evidence that has always existed where a defendant has pleaded guilty and the only issues being tried relate to the degree of the crime and the penalty to be imposed. In such cases wide leeway in the admission of evidence is permitted. (*People* v. *Green*, 47 Cal. 2d 209, 236 [302 P.2d 307]; *People* v. *Gilbert*, 22 Cal.2d 522, 528 [140 P.2d 9]; *People* v. *Thomas*, 37 Cal.2d 74 [230 P.2d 351].) If there are any limitations on the admission of such evidence, it is certainly the rule that if the evidence would have been admissible on the trial of the guilt issue, it is admissible on the trial aimed at fixing the penalty. That is this case. Here the evidence of the other crimes offered by the prosecution demonstrated that such crimes were closely related in time and in method to the crime charged. In the recent case of *People* v. *Glatman, ante,* p. 283 [340 P.2d 8], this precise point was passed on. There the defendant was charged with two murders, to which charge he pleaded guilty, and he agreed that the penalty trial could be before the court without a jury. On that hearing evidence as to the killing of a third woman, and of a sexual assault on another was offered and admitted. Defendant had not been charged or convicted of these offenses. The admission of this evidence was upheld. This court stated, at page 286: ''Evidence was also received regarding the circumstances surrounding the killing of Judy Dull and the Lorraine Vigil incident. No objection was made to the introduction of this evidence, and defendant cannot now question the propriety of its admission. (*People* v. *Feldkamp*, 51 Cal.2d 237, 241 [331 P.2d 632].) Moreover, the evidence was properly admitted with respect to both the degree of the crimes and the penalty. The facts of the Dull case were

similar and in many respects identical with those relating to Shirley and Ruth, and it was shown that defendant was following substantially the same procedure with Lorraine Vigil when his attempt to have intercourse was interrupted by the arrival of a police officer. The evidence of the other similar offenses would have been admissible on the issue of guilt to show defendant's motive and intent (*People* v. *Coefield,* 37 Cal.2d 865, 869-870 [236 P.2d 570] ; *People* v. *Peete,* 28 Cal.2d 306, 314-317 [169 P.2d 924] ; *cf. People* v. *McCaughan,* 49 Cal.2d 409, 421-422 [317 P.2d 974]), and it was likewise admissible on the issue of the degree of the crime to which he had pleaded guilty. The evidence of the other crimes was admissible in the proceeding to determine the penalty under section 190.1 of the Penal Code, which provides that any evidence concerning the commission of the crime that is admissible in the trial determining the guilt of the defendant may be admitted on the issue of penalty.''

 Jones' new counsel, appointed at his request after the oral argument, also argues this point, and contends that the plan or scheme exception to the general rule is not here applicable because the crime charged was murder and the other crimes were numerous rapes and robberies. It is urged that the other crimes did not show a general plan or scheme to commit murder. But the prosecution was based on the theory that the killing was first degree because committed during the commission of rape and robbery. The evidence of the other crimes certainly showed a general plan or scheme to commit rape and robbery. Thus the challenged evidence showed a general plan or scheme to commit an essential element of the offense charged. The evidence was admissible.

 Jones' counsel next argues that the trial court did not properly exercise its discretion in imposing the death penalty because ''the Court felt obliged to impose the death penalty unless it was satisfied that a lighter punishment should be imposed, and that if the Court could not find extenuating circumstances to lighten the punishment, . . .'' (Jones' Open. Br. p. 4.) It is also argued that the court erred in that it did not consider with equal favor life imprisonment and the death penalty. If these were the facts, counsel's arguments might be meritorious. *People* v. *Green,* 47 Cal.2d 209 [302 P.2d 307], and *People* v. *Friend,* 47 Cal.2d 749 [306 P.2d 463], hold that the discretion of the jury (or of the trial court, whichever has the duty to impose the penalty) is absolute and not fettered by any rule of law which

requires a certain choice when certain evidence is presented. As stated in *People* v. *Brice,* 49 Cal.2d 434, 437 [317 P.2d 961] : "It is settled that, regardless of the circumstances connected with a murder of the first degree, there is no requirement of or preference for either of the applicable penalties but that, to the contrary, the selection of punishment is in every instance completely within the absolute discretion of the jury."

The record does not sustain Jones' contention that the trial court did not exercise its discretion properly. In giving its decision the trial court stated: "In the week that has intervened, the Court has carefully reviewed the transcript and the evidence and has made its decision upon the evidence presented and the law applicable thereto, uninfluenced in any way by certain issues which the Court feels were regrettably introduced in this case during argument.

"In arriving at its decision on the issue of penalty, the Court has reflected upon what the Supreme Court has heretofore set forth as factors to be accorded weight and consideration, such as: The several objectives of punishment, the deterrence of crime, the protection of society, the desirability of stern retribution, the desirability of sympathy or clemency, age, sex, human passion, ignorance or weakness, the possible uncertainties attaching to life imprisonment, and the irrevocableness of an executed sentence of death."

Thus, it cannot be said that the trial court viewed either punishment with less favor than the other. It is quite clear that the trial court in fact exercised its absolute discretion soundly without feeling bound by any particular circumstances of evidence to choose one or the other alternative. It has made a meaningful choice between the penalties, based upon the evidence and upon factors it may justifiably consider. Its discretion cannot, therefore, be disturbed. (*People* v. *Riser,* 47 Cal.2d 566, 575 [305 P.2d 1].)

It is also urged on behalf of Jones that the trial court "sought" evidence in aggravation of the penalty when it allowed the evidence of the other rapes and robberies to be admitted, and did not "seek" any evidence in mitigation. If evidence in mitigation had been presented by counsel for the defendants there is no reason to believe that the trial court would not have admitted and considered it. But no such evidence was offered and refused admission. The contention that the trial court did not consider the fact of the defendants' youth, the defendants' remorse, or the absence of "formed

intent'' cannot be sustained in light of the trial court's careful study of the evidence, and the facts and circumstances of the case.

Jones' newly appointed counsel argues that it was error for the prosecuting attorney to argue that life imprisonment, if imposed, would actually mean less than life. Although there is out-of-state authority to the contrary, the rule in this state is that such argument, or even an instruction to that effect, is proper. This position was recently reaffirmed by this court in *People* v. *Chessman, ante,* pp. 467, 495 [241 P.2d 679], where the pertinent authorities are collected. Counsel frankly asks us to reverse these holdings. We think the rule is sound and should not be changed.

New counsel also argues that Jones should be permitted now to withdraw his guilty plea and be sent back for trial on the substantive offense. Hamilton's counsel made a motion to the same effect in the trial court, which was denied. Counsel attaches to his brief a letter from Jones' mother, in which letter the mother states that she was present during a conversation between Jones and his then counsel, and heard counsel tell Jones that he had a ''deal'' for life imprisonment with the district attorney and that the trial judge would not impose the death penalty. A letter from Hamilton to the same effect is also attached. It is argued that the guilty pleas were induced by these representations.

Aside from the lack of propriety of attempting to raise this issue in this fashion, there is no merit in it. The facts show that both Jones and Hamilton entered their guilty pleas knowingly and intelligently without inducement by the trial court or prosecuting attorney. It undoubtedly is and should be the law that representations of private counsel as to a purported commitment as to penalty from a responsible state official, if the acts of such official substantially corroborate the representations, where relied upon by a defendant in good faith, will constitute justification for permitting a withdrawal of a guilty plea (*People* v. *Gilbert,* 25 Cal.2d 422, 443 [154 P.2d 657]), but that is not the situation here disclosed by the record. No word or other act on the part of prosecuting attorney or of the trial judge could have been relied upon to support the representations of counsel, if such were made. The trial judge was extremely careful in warning defendants of the possible consequence of their pleas, and in telling them in simple, easily understood language that the death penalty was a possibility and that no deals had been made. The

record shows that the prosecution, at all times, urged that the death penalty be imposed, and that both defendants knew this before entry of their pleas. The request to withdraw the guilty pleas must be denied.

The basic argument presented by defendant Hamilton is that the prosecution did not establish the manner in which the victim died, and did not show conclusively whether the death of the victim was caused by accidental or intentional means. Counsel argues that "there is more than a reasonable doubt as to the defendants' responsibility for deceased's death." Counsel asserts that since none of the other victims of defendants' criminal assaults were murdered, it is unlikely that the defendants intentionally took the life of Mrs. Rivers. Attention is also called to the fact that defendants made a similar attack a week after the alleged murder, and it is argued that this shows that it is unlikely that they intentionally killed Mrs. Rivers. Counsel concludes that, at most, the evidence is equally balanced on the issue of whether the victim's death was accidentally or intentionally caused by defendants.

The argument is specious. A voluntary plea of guilty is the equivalent of a conviction of the crime. (*People* v. *Hickman*, 204 Cal. 470 [268 P. 909, 270 P. 1117]; *People* v. *Goldstein*, 32 Cal. 432.) It amounts to an admission of every element of the crime charged. (*People* v. *Whitton*, 112 Cal. App.2d 328 [246 P.2d 60]; *People* v. *Ward*, 118 Cal.App.2d 604 [258 P.2d 86]; see 14 Cal.Jur.2d, Criminal Law, § 247, p. 492.) Thus after a plea of guilty properly received the prosecution is under no duty to prove that defendants committed the crime. That issue was resolved by the defendants' plea.

 If it be assumed that the evidence presented by the prosecution did not clearly establish that the defendants *intended* to cause the death of Mrs. Rivers, the evidence, nevertheless, beyond any doubt, established the fact that the defendants' crime amounted to first degree murder. Mrs. Rivers' death occurred as the result of the defendants' perpetration of a felony, or two or three felonies, that is, rape, robbery, and burglary. It was therefore murder in the first degree under the felony-murder rule. (Pen. Code, § 189.) There is, of course, no doubt that the death penalty can be imposed for a murder in the first degree under the felony-murder rule. (See *People* v. *Cheary*, 48 Cal.2d 301 [309 P.2d 431].)

Counsel urges that if the killing was accidental, even if it occurred during the commission of a felony, such fact would have some bearing on the penalty imposed. This was a trial court problem, and the point was urged in the trial court. In *People* v. *Jackson*, 36 Cal.2d 281, 288 [223 P.2d 236], it was stated: "Finally, there is defendant's argument that the trial court abused its discretion in imposing the death penalty upon him. The contention seems pointless. Admittedly the homicide here involved was committed in the perpetration of a robbery, and as such constituted murder of the first degree. (Pen. Code, § 189; *People* v. *Bautista*, 22 Cal.2d 867, 869 [141 P.2d 417]; also *People* v. *Lindley*, 26 Cal.2d 780, 791 [161 P.2d 227]; *People* v. *Isby*, 30 Cal.2d 879, 888 [186 P.2d 405].) While defendant urges that the killing was 'accidental . . . precipitated by the unfortunate attempt of the deceased to wrestle the gun from defendant,' and that the 'Probation Officer reported . . . a recommendation of life imprisonment,' these same matters were fully argued at the hearing to determine the degree of murder and the sentence to be imposed therefor. Their evaluation in the light of the entire record was for the trial court's consideration, and it unquestionably appears that the trial court, acting within its discretion and upon a consideration of all the circumstances, fixed the sentence in accordance with the statutory authority vested in it." (See also *People* v. *Thomas*, 37 Cal.2d 74, 77 [230 P.2d 351].)

It should be pointed out that the evidence does not show that the killing was accidental. Mrs. Rivers' death was caused by strangulation. The autopsy surgeons so testified. A knotted rag was found around her neck. Jones stated to the police that when he entered the room he saw Hamilton choking the victim with a rag around her neck, trying to keep her quiet. Moreover, a motive existed for the killing. Defendants had threatened their other victims with death should they reveal defendants' identity. They were fearful of recognition. There is evidence that Hamilton had known Mrs. Rivers before the attack, although he denied this fact on the witness stand. Jones admitted to the police that he had met the victim prior to the attack.

Hamilton cites a great many heinous murders where life imprisonment was imposed instead of the extreme penalty. The fact that there are such cases only emphasizes how complete the discretion of the jury or trial court is in imposing the appropriate penalty.

Hamilton also argues that the trial court erred in not allowing his offer to repeat his testimony under the influence of truth serum. The "offer" arose in the following manner:

"Mr. Hardeman [Hamilton's counsel] : Q. Phillip, I think we—you have discussed with me previously the statement you have made here under oath, is that correct? A. That is correct, sir. Q. And you have told me repeatedly that the statements you have made are the truth, is that correct? A. That is correct, sir. Q. You have also asked me that you would be willing to make these same statements under what they call the truth serum, sodium pentothal? A. That is right, sir. . . . Q. Are you willing to make those same statements you have made under oath under the truth serum now? A. Yes. Yes, sir, I am. And I wish that your Honor would grant me permission. I would like very much to take this statement under the truth serum. Mr. Hardeman: No further questions, your Honor."

It is apparent that Hamilton's counsel made no proper offer of proof with regard to subjecting his client to a truth serum test and offering the results of such a test into evidence. Therefore, even if the results of such a test were admissible, no error was here committed in the absence of a proper offer of proof. (*People* v. *Spigno*, 156 Cal.App.2d 279, 291 [319 P.2d 458].)

Moreover, the result of such a test is not admissible in a criminal case. The courts have consistently held that whether the test is a polygraph test, or a sodium amytal or sodium pentothal test, the results are not such as to be admissible for or against the defendant because of a lack of scientific certainty about the results. (*People* v. *Aragon*, 154 Cal.App. 2d 646, 658 [316 P.2d 370] ; *People* v. *Wochnick*, 98 Cal.App. 2d 124, 127 [219 P.2d 70] ; *People* v. *Carter*, 48 Cal.2d 737, 752 [312 P.2d 665] ; *People* v. *Parrella*, 158 Cal.App.2d 140, 147 [322 P.2d 83] ; *People* v. *Porter*, 99 Cal.App.2d 506, 510 [232 P.2d 151] ; *People* v. *McNichol*, 100 Cal.App.2d 554, 558 [224 P.2d 21] ; *People* v. *Cullen*, 37 Cal.2d 614, 626 [234 P.2d 1] ; Witkin, California Evidence, pp. 371-373, §§ 332-335; 39 Cal.L.Rev. 439; 6 Stan.L.Rev. 172; 42 Cal.L.Rev. 880; 69 Harv.L.Rev. 683; 23 A.L.R.2d 1310.) These tests do not scientifically prove the truth or falsity of the answers given during such tests. (See generally, *Lindsey* v. *United States*, 237 F.2d 893, 897, for an interesting discussion of the problem.)

Hamilton's final argument is that the prosecuting attorney committed prejudicial misconduct during his final argument to the court, in that he "charged the air of the court with hostility."

It is claimed that the prosecuting attorney was guilty of misconduct when he stated that the defendants had forced their victims into acts of sexual perversion. There was, however, some evidence that this was the fact. Another cited instance of misconduct is that the district attorney referred to the rag which was found around the victim's neck as "blood stained" when in fact it was stained only with post mortem fluids. The officer who discovered the body of the victim testified, however, that the rag was of a dark color because it had on it a "mixture of blood and body fluids."

Appellant Hamilton also complains that there was conjecture on the part of the district attorney as to how the crime was committed. In view of the scientific evidence as to how Mrs. Rivers died, the stories told the police by both defendants, and the defendants' pleas of guilty, it cannot be said that the district attorney's conjecture as to how the crime was committed was either unwarranted or incredible.

Hamilton complains that the district attorney referred to the victim's "bloated body," when in fact the body became bloated only as a result of post mortem processes. The district attorney might well have been simply referring to the fact that Mrs. Rivers was a corpulent person. Hamilton finally complains that the district attorney speculated that the defendants after committing their heinous crimes went back to their girl friends. This statement by the district attorney was in connection with his argument that one defendant was not being led by the other, that each appeared intelligent, and that each had been charged with, and there was evidence that each had committed, rapes and robberies separately. There was "speculation" by the district attorney that the defendants went back to their girl friends after each of these crimes. However, there was evidence that both defendants had girl friends, and the statement by the district attorney was presented merely as a supposition, and not as a fact.

It should also be pointed out that the hearing below was before the trial judge, not before a jury. It cannot be presumed that the trial judge allowed himself to be prejudiced by the extravagant statements.

The hearing below was conducted with utmost fairness. At

every stage of the proceedings the trial court was careful to see that defendants were completely apprised of their rights. The trial court's exercise of its discretion in imposing the death penalty cannot be set aside.

The motion to be permitted to withdraw the pleas of guilty is denied; the orders denying the motions for new trials and the judgments are affirmed.

Gibson, C. J., Traynor, J., Schauer, J., Spence, J., and McComb, J., concurred.

Appellants' petition for a rehearing was denied September 22, 1959.