[Crim. No. 3384.   First Dist., Div. One.   Mar. 3, 1958.]

THE PEOPLE, Respondent, v. ROBERT CARMEN PARRELLA, Appellant.

Elliot Wax, under appointment by the District Court of Appeal, and Wax & Howard for Appellant.

Edmund G. Brown, Attorney General, Clarence A. Linn, Assistant Attorney General, and Raymond M. Momboisse, Deputy Attorney General, Robley E. Morgan, District Attorney (Santa Clara), and John Schatz, Jr., Deputy District Attorney, for Respondent.

PETERS, P. J.—Defendant was charged and convicted of forceful rape and of burglary while armed with a deadly weapon. Judgment was entered accordingly, and from that judgment and from the order denying the motion for a new trial the defendant appeals.

The offenses occurred on November 28, 1956. On that day the prosecuting witness, who lived in Mountain View with her husband and two children then aged 2 years and 2 months respectively, saw her husband off to Stanford University where he was a graduate student and laboratory assistant, and then went about her normal household tasks. At about 11:30 a. m. she went outside to call her 2-year-old son to lunch. There she was accosted by a man she had never seen before who asked her about a nonexistent address, and then asked her if she knew a "Domonico" or "Dominquez" family in the neighborhood. When the prosecuting witness replied that she did not, the stranger asked if he could look at a telephone book. She agreed to get it, went into the house, got the book and gave it to the stranger, and went back in the house with her son, leaving the stranger outside. Several minutes later the doorbell rang, and she opened the back door to get the telephone book. The stranger grabbed the door and forced his way into the house. He had an open pen knife in his right hand which he held at the level of the prosecuting witness' face. He threatened: "Don't make any noise or I'll kill your little boy." The stranger then forced the prosecuting witness into the bathroom and closed the door. The 2-year-old son was in the room. He then ordered the prosecuting witness to disrobe, holding the knife in a threatening position. She did so. He ripped some of her clothing, bound her hands behind her back, gagged and blindfolded her, and then ordered her to lie on the floor. She did so, and he then raped her. He then took her son into the kitchen, but returned in a few

moments, and raped the prosecuting witness again. While performing this act the stranger placed his knife at her throat. He then inquired where she kept her money. She told him. He left the bathroom, walked around the house for a while and then left.

The prosecuting witness was able to free herself. She telephoned her husband and called the police. When the police arrived the witness still had the cloth on her wrists and around her neck that had been used to gag and bind her. She gave the police an excellent description of her assailant and of his clothing. She then went to her family doctor who testified that there had been sexual penetration within several hours of the examination. The husband of the prosecuting witness testified that he had not had intercourse with his wife on the day of the attack or on either of the preceding two days.

As already pointed out, the prosecuting witness gave a complete description of her assailant to the police, and also described in detail the clothing he was wearing. The description fits that of defendant.

On Sunday, December 16, 1956, the prosecuting witness went to church in Mountain View. As she was leaving the church she saw her assailant outside, apparently waiting to attend the next Mass. She went to the priest's house and had him call the police. When the police arrived she accompanied an officer and the priest to the choir loft where she could observe the entire congregation. She immediately identified and pointed out appellant as her assailant, and then collapsed. The appellant was arrested outside the church. The prosecuting witness positively identified appellant in a police line-up and unequivocally identified him as her assailant at the time of trial.

In addition to the fact that the description given to the police after the attack fitted appellant, there were other corroborating details. At appellant's home were found pants, a jacket and a pocket knife similar to the clothes worn and knife used by the assailant. Of even more significance, on the bathroom floor where the attack occurred was found a partial palm print from a man's left hand. An expert from the State Bureau of Criminal Investigation testified that unquestionably this print was that of appellant.

Appellant's defense was an alibi. He, his wife, his mother-in-law and a neighbor testified that appellant was home with his family all of the morning of November 28, 1956. In rebuttal the prosecution called a Mrs. Trout who testified that

between 10 and 11 a. m. on that morning the appellant appeared at her home in Mountain View. In response to his request, she gave him her telephone book and left her apartment to take some laundry downstairs. She unintentionally locked herself out of her apartment. Appellant then left. Mrs. Trout positively identified appellant as the man involved. She also testified that the clothing found in appellant's home was similar to the clothing worn by appellant that morning. On the evening of November 28, 1956, she had given a description of the man involved to the police, and that description fitted appellant. When Mrs. Trout identified appellant in open court as the man involved he flew into a rage and, among other things, yelled at the witness: "You better get out of here before I come over there and really do something. Mr. Schatz [prosecuting attorney]: May we take an adjournment? The Defendant: Better take her with you too. Don't you accuse me. I'm no animal. The Witness: I know you're the one. I wouldn't say it if you weren't. The Defendant: Didn't do nothing, nothing. I was home. . . . In jail because of two women."

No direct attack is made on the sufficiency of the evidence. In view of the positive identification by the prosecution witness and the palm print such attack would necessarily be unsuccessful. The evidence in support of the conviction is clear, substantial and convincing.

The first contention of appellant is that prejudicial error occurred in connection with certain evidence relating to a lie detector test given appellant. The first mention of this test came into the record during the direct examination of appellant by his own counsel under the following circumstances:

"Q. Did you remain in that cell all that day and night? A. Up until that night. I volunteered for a lie test, I wanted to take a lie test, wanted to clear it. That was the only time I was out of the cell that day. Q. Did you take that test? A. Right. Q. On that day? A. Right."

The prosecutor made no objection to this evidence, but on cross-examination the following occurred: "Q. All right. And while you were at the police station, you told them that you weren't guilty of this heinous offense, isn't that correct? A. I did. Q. And that you wanted a lie detector test, isn't that right? A. That's right. Q. And they took you up to Berkeley to give you a lie detector test? A. I think it was Berkeley. Q. You know it was Berkeley? A. Yes. Q. That was the Berkeley Police Department there, wasn't it? A.

Right. Q. Where they gave you the lie detector test? A. Right. Q. Do you know the results of the lie detector test? A. No. Mr. Racanelli: Counsel knows better. I don't care what the results are, for or against, it's not allowed in any Municipal Court of law. I ask he be cited for misconduct. Mr. Schatz: I will offer the report at this time marked for identification just so there will be no question about it. Mr. Racanelli: I'm not concerned about the report. I'm concerned about the question as to the results. Mr. Schatz: I asked no questions of any witnesses, police officers, about any lie detector test. On his own, this defendant brought it out on direct testimony. He said, 'I offered to take a lie detector test,' and I think the jury is entitled to know what the results of that was under these particular circumstances. Mr. Racanelli: That is the viciousness of that statement, 'entitled to know.' Counsel well knows the law in this state regarding the admissibility of so-called lie detector tests. I'm going to ask, Your Honor, that, as this is detrimental to my client's interests I'm going to ask Counsel be admonished and the jury be admonished in this regard. The Court: The witness on the stand testified on direct that he had offered to take a lie detector test. Mr. Schatz: He did. The Court: Then on cross-examination has he not a right to follow that up and ask if he did and what the results of it was or anything of that sort? Mr. Racanelli: I submit, Your Honor, as Your Honor knows, the law is clear in this state and I don't know what the lie detector is, for or against, to be quite frank, Your Honor, but it's inadmissible in any event and this may delude the jury into thinking it should be produced and there's some reason why it isn't, all to the detriment of the defendant. The Court: Of course, a lie detector test is not admissible in evidence. Mr. Schatz: That is true. I would never have brought it up if it wasn't offered in his direct testimony. The man said he wanted a lie detector test. Mr. Racanelli: He can ask any question about that, he cannot ask any question about what the results are. Mr. Schatz: I will withdraw the question. Mr. Racanelli: Once it's inserted, the damage is done. I ask the jury be asked to disregard the comments of Counsel. The Court: Ladies and gentlemen of the jury, the question of lie detector has no place in the case. It has been determined that lie detectors are not admissible in evidence in a trial of a case. Now, the question that the District Attorney has been asking this witness up to date was proper because the witness on direct examination stated that he offered to take a lie detector test

and the District Attorney then had a right to ask him whether he had taken it or not. But beyond that, we can't go. So just confine your consideration of the matter to those two questions. Mr. Schatz: If Your Honor please, without going into the results of that examination, may I ask the witness if he was given more than one lie detector test inasmuch as he's introduced the subject. Mr. Racanelli: No objection to that. The Court: Ask that question. Q. (By Mr. Schatz) Were you given more than one detector test? A. Yes. Q. Were you given several? A. Yes. Q. They all were given by the Berkeley Police Department? A. Right.''

In the closing argument of the prosecutor the following occurred:

''Then comments were made by Counsel about the lie detector test. So there will be no misunderstanding between us, I want to talk about this for just a little bit. I think it's pretty clear by now that the results of a lie detector test aren't admissible in evidence. But now, consider this position that we were in, if you please. Think about this. Here's a witness who sits on the witness stand on direct examination. Remember, I never asked the Chief, I never asked the officer, anybody, about anything to do with the lie detector test. Give us some credit for knowing some of the law. We don't profess to be perfect but we know some of it. It was the defendant himself sitting there on the witness stand and I have forgotten just how it came about and he says, 'I voluntarily took a lie detector test.'

''Aha! There is something the prosecution didn't tell us about. And I can hear Mr. Racanelli now if I hadn't offered it in evidence and made sure that you ladies and gentlemen knew that we had a record and had nothing to hide. Mr. Racanelli stood before you then——

''Mr. Racanelli: Your Honor, I'm sorry. I really dislike interrupting, Counsel. It breaks the continuity. I dislike doing it. Comments like that is getting right back to the objectionable matter. He is arguing inferences from something inadmissible. I ask the jury be admonished.

''The Court: I think I explained to the jury during the trial and I will instruct you now, you are not to consider any question about lie detector. It is not admissible and whether it was good, bad or indifferent makes no difference and when you go into the jury room, I don't want anyone to mention or think of any lie detector test. Now, that settles that. There's no lie detector business in this case.

"Mr. Schatz: That is the point. So long as there is no speculation about it, that is all we are interested in.

"The Court: No speculation about it."

█ There can be no doubt that evidence about the results of the lie detector test was inadmissible. (*People* v. *Carter*, 48 Cal.2d 737 [312 P.2d 665] ; *People* v. *Porter*, 136 Cal.App. 2d 461 [288 P.2d 561] ; *People* v. *Porter*, 99 Cal.App.2d 506 [222 P.2d 151] ; *People* v. *Wochnick*, 98 Cal.App.2d 124 [219 P.2d 70] ; *People* v. *Aragon*, 154 Cal.App.2d 646 [316 P.2d 370].) █ It is also the law that an accused's willingness or unwillingness to take such a test is not admissible. (*People* v. *Carter*, 48 Cal.2d 737 [312 P.2d 665].) █ Generally, the admission of such evidence is error and such error is not cured by a warning instruction. (*People* v. *Wochnick*, 98 Cal. App.2d 124 [219 P.2d 70].)

█ There would seem to be little doubt that appellant's statement that he had volunteered for and taken such a test was inadmissible. Had the prosecution objected the objection should have been sustained. █ But the prosecution did not object, but on cross-examination inquired into the subject more fully, and even offered to introduce the result of the test. After the court had ruled, properly, that the results of the tests were not admissible, the prosecution agreed to withdraw the question.

In so proceeding the prosecutor undoubtedly committed error. █ The law is clear that legitimate cross-examination does not extend to matters improperly admitted on direct. Immaterial and irrelevant testimony cannot be thus brought before the jury under the guise that it is legitimate cross-examination. (*People* v. *Heckford*, 149 Cal.App.2d 250 [308 P.2d 497] ; *People* v. *McDaniel*, 59 Cal.App.2d 672 [140 P.2d 88].) █ But admitting it was error, was the error prejudicial? The trial court carefully warned the jury when the evidence was improperly admitted that "the question of lie detector has no place in the case," and when the prosecutor mentioned it in his closing argument the court told the jury that it was "not to consider any question about lie detector. It is not admissible and whether it was good, bad or indifferent makes no difference and when you go into the jury room I don't want anyone to mention or think of any lie detector test. Now that settles that. There's no lie detector business in this case."

Under such circumstances the error was not prejudicial.

148

It was not only invited error, but the trial court carefully, correctly and fully warned the jury about such evidence. Moreover, the evidence of guilt is strong. The prosecuting witness positively identified appellant. Mrs. Trout unequivocally refuted appellant's alibi. The state expert placed appellant in the bathroom with his testimony about the palm print. Under such circumstances there was no prejudice to the appellant in admitting the evidence or in the comments of the prosecutor.

Appellant next complains of the admission of the testimony of Mrs. Trout, claiming it was not admissible to show common scheme, design or plan, and that the jury should have been informed by a limiting instruction that the evidence was only admissible to refute the alibi of appellant. This error was compounded, so it is contended, when the prosecuting attorney in his argument referred to Mrs. Trout's testimony in the following fashion: ''She was the one who came in and testified that the defendant came to her house somewhere between 10:00 and 11:00 the same morning he raped Mrs. Landgraf, the same morning that he came to her home. She remembers that she gave him a telephone book. Of course, we couldn't go into what the conversation was. She remembers the same morning she gave him a telephone book and I think she might say a little prayer thanking God Almighty that the door locked behind her and it wasn't intentional, it was only accidental. There was the first victim, there was the first victim, and don't make any mistake about it. Thank God the door locked behind her.''

Of course, Mrs. Trout's testimony was admissible to rebut appellant's alibi. He, and his wife, and his mother-in-law, and a neighbor had testified that he was at home on the morning in question. The testimony of Mrs. Trout was admissible to rebut this evidence. Even though the evidence may not have been admissible to show plan or design, it was still admissible to rebut the alibi. (*People* v. *Green,* 15 Cal.App.2d 608 [59 P.2d 824] ; *People* v. *Wheaton,* 64 Cal.App. 58 [220 P. 451].)

Moreover, so far as the argument above quoted is concerned, appellant made no objection at the trial. In the absence of an assignment of misconduct appellant is precluded, except in unusual cases of which this is not one, from raising the point for the first time on appeal. (*People* v. *Hampton,* 47 Cal.2d 239 [302 P.2d 300] ; *People* v. *Johnson,* 153 Cal.App.2d 564 [314 P.2d 751].)

The point that the trial court failed to give a limiting instruction cannot be raised for the first time on appeal. Appellant made no request for such an instruction. The court was not required to give it of its own motion. (*People* v. *Johnson*, 153 Cal.App.2d 564 [314 P.2d 751].)

Appellant complains that the prosecuting attorney was permitted to read, during his closing argument, from the transcript about the outburst in open court made by appellant while Mrs. Trout was testifying. This was proper argument. Appellant's outburst amounted to an attempt, by threats, to suppress evidence. Thus, it was admissible and the proper subject of comment. (*People* v. *Chin Hane*, 108 Cal. 597 [41 P. 697] ; *People* v. *Kendall*, 111 Cal.App.2d 204 [244 P.2d 418] ; *People* v. *Moore*, 70 Cal.App.2d 158 [160 P.2d 857].) The jury heard this outburst. The incident was indelibly impressed on their minds. How could reading verbatim from the transcript have adversely affected the rights of appellant? It did not.

Appellant next complains that his cross-examination of the expert from the Bureau of Criminal Identification was unduly curtailed. That expert had identified the partial palm print found on the bathroom floor as being that of appellant. On cross-examination appellant asked: "In your experience in this type of work, isn't it true that in more than one occasion, to your own knowledge, two different experts have disagreed on the interpretation of the same prints under question?"

The trial court properly sustained an objection to this general question. Appellant could have rebutted the testimony of this witness by producing an expert of his own, or by cross-examining about his identification of the particular handprint. Neither course was pursued. Instead, appellant sought to ask the question about experts, generally, in this field, differing in their interpretations. The fact that experts may sometimes disagree as to the interpretation of some prints, has no relevancy as to whether experts could disagree as to the interpretation of this print. Insofar as it failed to relate to the specific print involved, the question was not material. It had no relation to the qualifications of the expert. There was no error in sustaining the objection.

The appellant next contends that the prosecutor was guilty of prejudicial misconduct in making the following statement to the jury: "But, you say, if the evidence against the defendant was so overwhelming, why didn't he plead guilty.

If he is guilty, why does a guilty man stand trial. For one thing, that is a constitutional right. For another, place yourself in his shoes. If he pleaded guilty, he also confesses his faithlessness to his family. If he stands trial, indeed, even when found guilty, the possibility exists that his family might still stand by him.'' No objection was made to this statement at the time it was made. This precludes an objection on appeal. (*People* v. *Johnson,* 153 Cal.App.2d 564 [314 P.2d 751].) The jury was fully instructed on the presumption of innocence and the burden placed on the prosecution. Moreover, the comment would appear to be a reasonable inference from the evidence, and so within the realm of fair comment. (*People* v. *Sieber,* 201 Cal. 341 [257 P. 64].)

The judgment and order appealed from are affirmed.

Bray, J., and Wood (Fred B.), J., concurred.