[Crim. No. 6063. Second Dist., Div. Three. Aug. 5, 1971.]

THE PEOPLE, Plaintiff and Respondent, v.
WALLACE LEROY SCHIERS, Defendant and Appellant.

## COUNSEL

Paul M. Posner for Defendant and Appellant.

Evelle J. Younger, Attorney General, William E. James, Assistant Attorney General, and Howard J. Schwab, Deputy Attorney General, for Plaintiff and Respondent.

## OPINION

SCHWEITZER, J.—In 1957 defendant was convicted of the second degree murder of his wife. (Pen. Code, § 187.) This court affirmed the judgment. (*People* v. *Schiers* (1958) 160 Cal.App.2d 364 [324 P.2d 981, 329 P.2d 1], hg. den.)

Over the years defendant has repeatedly and unsuccessfully sought relief in both the state and federal courts. In 1965 he was paroled. On September 21, 1970, defendant filed an "Application for Recall of Remittitur or, in the Alternative, Petition for a Writ of Habeas Corpus." Pursuant thereto, on January 12, 1971, this court vacated the judgment, recalled the remittitur, and reinstated the appeal for the reason that at the time of defendant's 1958 appeal, he was an indigent person, appeared in propria persona, and had not been furnished counsel. (See *Swenson* v. *Bosler*, 386 U.S. 258 [18 L.Ed.2d 33, 87 S.Ct. 996]; *Douglas* v. *California*, 372 U.S. 353 [9 L.Ed.2d 811, 83 S.Ct. 814].) We therefore consider this as an original appeal from the judgment entered August 7, 1957.

### Facts

Although there is a factual summary in the prior opinion of this court (*People* v. *Schiers, supra*, 160 Cal.App.2d at pp. 367-371), the summary therein contained is insufficient to meet the many contentions now raised. Of necessity we therefore restate the facts.

Defendant was employed as an electronic assembly supervisor at the

Bendix aviation plant in the San Fernando Valley. His wife was a member of a local women's club. On the morning of February 12, 1957, the victim had an appointment to meet two ladies at the women's club. Alarmed by her failure to keep the appointment, they went to the victim's residence, rang the bell and knocked on the door, but no one answered. One of the ladies entered the house through an unlocked rear door. Upon opening the door to the victim's bedroom, the lady discovered the nude body of the victim on the floor; she had been brutally beaten. Cause of death was subsequently determined as multiple fractures of the skull, with intracranial hemorrhage and cerebral contusions. The murder weapon was never found, although the victim's mother testified that she noticed about a week later that two small star-shaped glass candlestick holders and a heavy ornamental champagne bottle were missing from the house.

An investigation by Los Angeles police officers disclosed that there were no signs of a struggle anywhere inside the house; that none of the outside doors or windows had been forced; that the only fingerprints in the victim's bedroom were her own; that there were no unidentifiable fingerprints elsewhere in the house; that the victim's purse, containing a check and some cash, was in the kitchen; and that the victim's wrist watch was lying on a dresser in her bedroom.

Leland V. Jones, a police lieutenant assigned to the scientific investigation division, arrived at the scene at 1:30 p.m. and observed that the bed and walls in the victim's room were covered with blood; that there were bloodstains on the ceiling; and that there was a blood spattered man's undershirt and a pair of men's shorts on the floor beside the bed. As an expert on the subject of forensic chemistry, he testified that in his opinion, based on the pattern of the stains on the undershirt, it had been lying in the same position when the victim's blood spurted around the room. He conducted benzidine tests in various rooms of the house, describing the test generally as follows: if a benzidine base, called a latent color, is mixed with an oxidase, the oxidase will carry oxygen to the latent color and the solution will turn blue; blood is an exceptionally good oxidase and will react to benzidine even when the solution is diluted to the extent of one part blood to three hundred thousand parts of water; the higher the proportion of blood, the more immediate and vivid will be the blue color reaction. In defendant's bathroom the officer tested the wash basin and the water in the commode; he obtained an immediate vivid blue reaction. He also noted a spot of diluted blood just above the faucets in the wash basin. There was no evidence of blood in the shower stall.

Meanwhile, defendant returned home from work, having been informed by telephone of his wife's death. It was suggested that he submit to a benzi-

dine test in order to eliminate him as a suspect; he consented. Defendant stepped into his wife's bathroom and removed his shirt. Officer Jones then dipped a cotton swab fastened to a short stick into the benzidine reagent and as he applied it to one of defendants' hands, it turned blue immediately. Alternately changing swabs, additional applications were made to defendant's palms, the front of his arms, and his chest. The officer testified: "Any place I touched the front of his body, I got an immediate blue line. . . . At that time Mr. Schiers pounded his hands and said, 'My God, this puts me in an awful position.' " Defendant was taken into the kitchen and asked to take off his trousers, which he did. Officer Jones testified: "At that time his hands were shaking and he was quite nervous . . . I ran . . . tests on his legs and I again got a very positive action on the front, all over the front of the body, on down to the knees, and from the knees down, I received no reaction whatever." The witness also made benzidine tests in the victim's bathroom and in other parts of the house, but found no additional traces of blood.

Officer Jones testified that bleaches, lead salts, nitrates and certain vegetable substances also react in a positive manner to the benzidine test. Because of this fact he tested washing powder and various soaps in the house to determine if there was a substance in them which might give a false reaction; the results were negative.

Ray Pinker, chief forensic chemist, Los Angeles Police Department, testified that on February 14 and 15 he repeated the benzidine tests of the premises. On these occasions he used a solution containing hydrogen peroxide so as to eliminate the possibility of false color reactions arising from bleaches. The chemist found no traces of blood in the victim's bathroom; however, he procured the same reactions in defendants' bathroom that had been obtained by Officer Jones. He also tested the soaps and detergents used in the household and found none which produced a color reaction.

There was conflicting evidence as to the time of death. Basing his opinion largely upon the rate of cooling of the victim's liver and the amount of alcohol in her blood, Dr. Frederick Newbarr, chief autopsy surgeon of the coroners' office, testified that the victim died some time between 10:30 p.m. on February 11 and 6:15 the following morning; he fixed the approximate time of her death at 2 a.m. Dr. Kenneth Johnson, a chemist and chemical engineer, expressed the opinion that the time of death was 7 a.m. He was not a doctor of medicine and admitted that he had never performed any experiments on the liver cooling rates of deceased persons.

Officer Louis Belle, one of the investigating officers, testified that he had a conversation with defendant on February 13; that defendant stated he

spent the evening of February 11 with his wife; that they ordinarily slept in separate bedrooms; that he retired to her bedroom around 1 a.m.; that he returned to his own bedroom an hour later, read a little and went to sleep; that he heard nothing unusual during the night; that he arose at 5 or 6 a.m., showered and shaved in his bathroom and left for work around 6:30 a.m.; that with respect to the benzidine test, defendant stated that he had not cut himself and could not understand why the test indicated the presence of blood on various parts of his body.

In defense, defendant denied killing his wife and testified that he spent the evening at home with her; that after dinner, he played solitaire and worked on income taxes while his wife watched television; that during the evening each of them drank some Scotch and beer; that they retired to his wife's bedroom at 1 a.m. and had sexual intercourse; that he left his undergarments on the floor; that he retired to his own bedroom an hour or so later, did not see his wife thereafter, and heard no noise during the night; that he arose at 5 a.m., took a shower, shaved and left for work at 5:30 a.m., and that the candlestick holders had been missing from his wife's bedroom for several months before her death; that he had thrown away the champagne bottle while cleaning out the kitchen a few days after the murder; that Officer Jones in making the benzidine test had only "made crossmarks up and down my arms and made, I think, three or four marks on the right and left sides of my chest"; and that he could not recall having come in contact with any of the substances mentioned by the People's experts which might have caused a positive reaction to the benzidine test.

On cross-examination, defendant admitted that he and his wife had separated briefly in 1955 because of his excessive drinking and gambling; that in December 1956 he obtained a $2,450 loan to construct a rumpus room and patio; that none of the loan proceeds were spent for that purpose; that he gave some of the money to his wife, sent some to a former wife, and spent the rest gambling and on other personal pleasures.

Four of defendant's fellow employees testified that defendant arrived at work on February 12 at his usual time, around 7 a.m, appeared to be calm, and performed his duties in a usual manner. Six persons testified that defendant's reputation for peace and quiet was good. It was stipulated that there were 22 other character witnesses in court, and that if they were called to the stand, their testimony would be in accord with that of the defense witnesses.

Although defendant raises numerous contentions of reversible error, we dispose of this appeal on the ground that the admission and subsequent

striking of evidence relating to a lie detector test was so prejudicial that defendant was denied a fair trial.

### Lie Detector Test

During trial and immediately before a noon recess, Officer Belle testified as follows: "On the night of February 12th, we had taken him to the Police Administration Building and gave him a lie detector test and *told him that the test indicated that he was lying* and asked him if he could explain that, and he said 'No, there was something wrong with the machine.' [¶] When we first asked him to take the test, he said he would if he could be shown the test was accurate, he was agreeable to take it. So Lieutenant Putty explained the test to him and asked him to pick out a card with a number on it, and when he was asked what the number was, he was to lie about it and the machine indicated he was lying. [¶] So Mr. Schiers felt that the test was a fair one and agreed to take it. *We told him that the test indicated that he was lying,* and he said that he couldn't understand it, even though he believed it was accurate when they showed him the experiment. *He couldn't understand why it indicated that he was lying when they asked the questions about the murder of his wife.*" (Italics added.)

Following the noon recess, defendant's counsel informed the court that he had "no recollection of the last fifteen minutes of the proceedings this morning" and stated that had he been aware of Officer Belle's testimony he would have entered an objection to it. The court granted defendant's motion to strike the testimony and admonished the jury as follows: "Ladies and gentlemen of the jury, just before the noon recess, Mr. Belle was testifying. There was some testimony regarding the conversation had between Mr. Belle and the defendant in this case in which a polygraph or so-called lie detector was a part of the conversation. The Court has granted a motion of the defendant to strike all of that testimony. Now, you are not to consider or even recall that part of Mr. Belle's testimony where he made any mention of . . . that part of any conversation . . . wherein anything regarding a lie detector was even hinted at. You are to pass it all out of your mind . . . and as far as you and I are concerned, no mention thereof has been made . . . it is no part of the record and is not to enter into your consideration or even be mentioned by any of you from this moment on."

 Evidence of the willingness of a party or witness to take a lie detector test or of the results of a lie detector test is inadmissible and is generally held to constitute prejudicial error. (*People* v. *Carter* (1957) 48 Cal.2d 737, 752 [312 P.2d 665]; *People* v. *Babcock* (1963) 223 Cal. App.2d 813, 817 [36 Cal.Rptr. 178]; *People* v. *Adams* (1960) 182 Cal.

App.2d 27, 34 [5 Cal.Rptr. 795]; *People* v. *Schiers* (1958) *supra,* 160 Cal.App.2d 364, 372; *People* v. *Parrella* (1958) 158 Cal.App.2d 140, 147 [322 P.2d 83]; *People* v. *Aragon* (1957) 154 Cal.App.2d 646, 657 [316 P.2d 370]; *People* v. *Wochnick* (1950) 98 Cal.App.2d 124, 127-128 [219 P.2d 70]; see Annot., Lie Detector Test—Willingness, 95 A.L.R.2d 819; Annot., Evidence—Deception Tests, 23 A.L.R.2d 1306, 1308.) Although *Babcock, Schiers* and *Parrella* recognized the general rule, each reached the conclusion that the error was not prejudicial; the remaining cases concluded that the error was prejudicial.

██ The People concede the error but, relying on our former opinion (*People* v. *Schiers, supra,* 160 Cal.App.2d at p. 373), contend that it was not prejudicial in view of the admonition and argue that it therefore did not result in a miscarriage of justice within the meaning of article VI, section 13 of the California Constitution. ██ ██ We must therefore attempt to determine whether or not it is reasonably probable that a result more favorable to defendant would have been reached in the absence of the error (*People* v. *Watson,* 46 Cal.2d 818, 836 [299 P.2d 243]), and are guided by principles set forth in *People* v. *Lyons,* 47 Cal.2d 311, 318 [303 P.2d 329], where the court said in quoting from *People* v. *Ford,* 89 Cal. App.2d 467, 470-471 [200 P.2d 867]: " '[W]here the misconduct is of such a character that it cannot be purged of its harmful effect by an admonition, it will be considered as a possible ground for reversal in cases where the jury has been admonished [citing cases] . . . . *[W]here the case is so closely balanced and guilt has not been so clearly established as to render it improbable that the harmful effect of the misconduct may have turned the scales against the accused, such misconduct has consistently been deemed ground for reversal.* [Citing cases.]' " (Italics added.)

Before reviewing and evaluating the evidence in the light of the foregoing principles, in order to fully appreciate the impact of this type of misconduct, we briefly analyze the cases in which the error was held to be prejudicial. In *Carter, supra,* 48 Cal.2d 737, 751-752, a witness, described as an "important suspect," testified as to his willingness to take a lie detector test. Apparently no objection was made thereto; the testimony was not stricken. The opinion states at page 752: "The court ordered stricken his further testimony that, 'and some other people wouldn't take [such a test]. . . .' but in view of the testimony the court permitted to stand, the implication survived that defendant had refused to take a lie detector test and that his refusal furnished some evidence of guilty knowledge." (Brackets in original.) *Wochnick, supra,* 98 Cal.App.2d 124, 126-128, was cited with approval. The judgment was reversed because of numerous errors, the court not indicating whether the lie detector testimony, by itself, would have resulted in a reversal.

In *Adams, supra,* 182 Cal.App.2d 27, 31-34, defense counsel on cross-examination elicited evidence that two prosecution witnesses had been given lie detector tests; the deputy district attorney asked questions about the tests on his redirect examination of each witness. There was no evidence as to the results of the tests. No objection to the questions was made, the evidence was not stricken, and the jury was not admonished to disregard the evidence. In his argument to the jury the prosecutor alluded to the evidence. In holding that the questions and argument constituted prejudicial error, the court noted at page 34 that "the prosecutor succeeded in getting the results of the lie detector tests before the jury in this indirect manner," and citing *Watson, supra,* 46 Cal.2d 818, 836, reversed the judgment on the counts affected thereby. No petition for hearing by the Supreme Court was filed.

In *Aragon, supra,* 154 Cal.App.2d 646, 653, 659, the deputy district attorney, in his opening statement, referred to a conversation in which defendant asked and was told that he failed a lie detector test; defendant's objection was overruled and the jury was admonished "[that] you are not to take into consideration that that is any evidence as to the efficacy of the lie detector test." (P. 654.) During trial, over defendant's objection, the conversation was repeated; the court admonished the jury "that you are to disregard any portion of the conversation which relates to the outcome of the lie detector test, or its efficacy as evidence." (P. 655.) On cross-examination of defendant the prosecutor asked about the conversation; defense counsel objected on the ground that it was improper cross-examination, stating: " 'This man has never denied that conversation or any part of it.' " (P. 657.) The objection was sustained, the court adding: " 'Any reference to the lie detector test, its out, or results [*sic*].' " (P. 657.) In holding that the prosecutor's misconduct constituted prejudicial error, the court held that his good faith and intentions were immaterial, and noted that there was no evidence of the accuracy of the test, the skill of the operator or that the test has received scientific recognition; that there is a popular belief that the test is reliable; that because of this belief, under the principles of *Lyons, supra,* 47 Cal.2d 311, 318, the admonitions were ineffective. No petition for hearing by the Supreme Court was filed.

The facts in *People* v. *Wochnick, supra,* 98 Cal.App.2d 124, 127-129, with respect to the lie detector test are identical with those in the instant case. In *Wochnick* a police officer testified that after defendant had been administered a lie detector test, he told defendant that the test indicated that he had guilty knowledge and asked defendant for an explanation; defendant replied that he had none. Despite the court's admonition to the jury that it could not consider that portion of the conversation relating to the test "as indicating whether or not there was any reaction to any technical test," the appellate court reversed the judgment, stating: "Despite the in-

struction of the court, the evidence of the partial results of the lie detector test with respect to defendant's reaction upon being shown the murder weapon was indelibly implanted in the minds of the jurors and could not but have had a prejudicial effect." (98 Cal.App.2d at p. 128.) A petition for a hearing by the Supreme Court was unanimously denied.

We now turn to the three cases that have held that the error was non-prejudicial. In *Babcock, supra,* 223 Cal.App.2d 813, 817-818, a police officer testified that he asked defendant if he would be willing to take a lie detector test; an objection was interposed, sustained and the jury admonished "to absolutely disregard it." In holding that the error was not prejudicial, the court noted that even though defendant's answer to the question was not stated, there was an inference that defendant either refused or made an unsatisfactory showing; and stated on pages 817-818 that notwithstanding this fact, "[w]e conclude from a review of the entire record, including the prompt objection by appellant's trial counsel and the court's admonition to the jury to disregard the statement, that the error was not so prejudicial as to warrant a reversal of the judgment. [Citing *Schiers, supra,* and *Parrella, supra.*]" No hearing by the Supreme Court was sought.

In *Parrella, supra,* 158 Cal.App.2d 140, 147-148, on direct examination defendant testified as to his willingness to take a lie detector test; the prosecutor did not object but on cross-examination brought out evidence that defendant had submitted to a test; he later sought to introduce the results of the test; the trial court ruled that the results were not admissible and admonished the jury to disregard the reference to the test. In his closing argument the prosecutor referred to the test and again the trial court admonished the jury "not to consider any question about lie detector." (158 Cal.App.2d at p. 147.) In holding that the error was non-prejudicial, then Presiding Justice Peters noted at page 148 that the error was invited, that the jury was fully admonished, and that the evidence of the guilt was strong. No hearing by the Supreme Court was sought. *Parrella* was decided approximately two months before *Schiers* and was not cited therein.

In the former appeal in the instant case (160 Cal.App.2d 364, 371-373), the court recognized the error and stated that the trial court should have halted the officer's testimony, even in the absence of an objection; that the prosecutor could not have anticipated the officer's voluntary statement concerning the use of the test; that "[i]n addition to granting the motion to strike, the court gave the strong admonition which we have quoted above. It is to be presumed that the jurors gave heed to the admonition and, in our opinion, the instruction was sufficient to dissipate the harm that had been done." (P. 373.) Without discussing or applying the principles suggested in *People* v. *Watson, supra,* 46 Cal.2d at page 836, and approved in *People*

v., *Lyons, supra,* 47 Cal.2d at page 318, the court concluded that the error was not prejudicial.

A hearing by the Supreme Court was denied by a four to three decision. Justice Carter filed a seven-page dissent (160 Cal.App.2d at pp. 379-385), stating on page 379 with respect to the admonition: "An admonition may cure minor error. But to hold that an egregious and shocking attack upon the integrity of an accused is blotted out of a juror's mind by a mere incantation is as fictional as John Doe. [Citing *Lyons, supra,* 47 Cal.2d 311; *Aragon, supra,* 154 Cal.App.2d 646; *Wochnick, supra,* 98 Cal. App.2d 124.]" He added at pages 379-380: "This 'error' was deliberately committed at the end of the prosecution's case. Behind it were the prestige of science, the glamour of a modern scientific testing device, with the immense publicity given the 'lie detector' in mass communication media. (See *People* v. *Aragon, supra,* at p. 658.) No expert testimony as to the accuracy of the instrument [*sic*], nor was the jury permitted to draw its own inferences from the questions asked during the test and the reaction of the instrument. The interpreter of the test may have been anybody, although this requires extensive training. [Footnote omitted.] In fact, Belle did not testify to the *test results;* he merely testified that defendant was told it was unfavorable to him, leaving an obvious inference to the jury. . . . [Citing *Aragon, supra,* and *Wochnick, supra.*] [¶] One would be credulous indeed to believe the prosecutor was surprised by Belle's revelation. . . . Both knew that such evidence is inadmissible. . . . By this decision the California judiciary invites repetition of such open debauchery of basic fairness to the discredit of bench and bar. In my opinion it amounts to a denial of due process of law." (Italics in original.)

 We note in the former opinion of this court (160 Cal.App.2d at p. 373) a statement that the prosecutor could not have anticipated the officer's voluntary statement, and Justice Carter's statements to the contrary, that the " 'error' was deliberately committed" and that it is improbable that "the prosecutor was surprised by Belle's revelation." Defendant's request to augment the record in connection with his former appeal to include the transcript of the preliminary hearing was denied. We have granted his request on this appeal and have augmented the record to include this transcript. (Cal. Rules of Court, rule 12(a).) We note therein that Officer Belle referred to the lie detector in his testimony at the preliminary hearing. This fact should have alerted the prosecution to the likelihood that Officer Belle would make a similar reference at trial, thereby imposing on the prosecution an obligation to warn the officer against possible error. As stated in *People* v. *Bentley,* 131 Cal.App.2d 687, 690 [281 P.2d 1]: "The district attorney knew, or should have known, the testimony the officer was going to give and should have warned him not to make the

statement. . . . The prosecutor has the duty to see that the witness volunteers no statement that would be inadmissible and especially careful to guard against statements that would also be prejudicial." ▮ We conclude that there was a sound basis for Justice Carter's comment that the prosecutor was not surprised by Officer Belle's voluntary statement, and that we were mistaken in our former opinion in indicating that the prosecutor could not have anticipated the statement.

Of the three cases holding that the error was not prejudicial, we find ourselves in agreement with the opinion in *Parrella, supra,* because of the invited error and the apparent application of the principles of *Lyons, supra,* 47 Cal.2d at page 318, and *Watson, supra,* 46 Cal.2d at page 836. These principles were not applied in our former opinion in *Schiers,* the contention of prejudicial error being dismissed almost summarily by reference to the fact that the prosecutor could not have anticipated the voluntary statement, a fact heretofore discussed and which we have concluded was probably erroneous, by reference to "the strong admonition," and by the statement that: "It is to be presumed that the jurors gave heed to the admonition and, in our opinion, the instruction was sufficient to dissipate the harm that had been done." (160 Cal.App.2d at p. 373.) We note also in our former opinion, although *Aragon, supra,* 154 Cal.App.2d 646, and *Wochnick, supra,* 98 Cal.App.2d 124, were cited as supporting the general rule of exclusion and prejudicial error, no attempt was made to distinguish either case, even though the factual situation in *Wochnick* was identical; also, the opinion failed to cite and consider *Carter, supra,* 48 Cal.2d 737, decided the preceding year and in which *Wochnick* was cited with approval. (48 Cal.2d at p. 752.) It is not clear whether the court in *Babcock, supra,* reviewed the record in the light of *Lyons, supra,* and *Watson, supra,* the court concluding that from its "review of the entire record, including the prompt objection by appellant's trial counsel and the court's admonition to the jury to disregard the statement, that the error was not so prejudicial as to warrant a reversal of the judgment." (223 Cal.App.2d at pp. 817-818.) *Babcock* cited as authority *Schiers* and *Parrella,* the only cases holding that the error was not prejudicial; it did not cite or attempt to distinguish the reasoning or principles of the other cases discussed herein, each of which had been decided prior to *Babcock.*

Returning to the instant case, the significant evidence supporting the judgment was the positive results of the benzidine and lie detector tests, testimony of an argument between defendant and the victim during the preceding evening, testimony of a marital separation between defendant and the victim two years prior to the incident, and testimony of defendant's misuse of borrowed funds approximately two months before the crime. Absent the evidence relating to the lie detector test, we would unhesitantly

hold that the evidence was sufficient to sustain the judgment. (*People* v. *Redmond*, 71 Cal.2d 745, 755 [79 Cal.Rptr. 529, 457 P.2d 321].)

Here, however, for the reasons set forth in Justice Carter's dissenting opinion in *Schiers* (160 Cal.App.2d at pp. 379-380), discussed and portions quoted *ante,* we conclude that the error was so prejudicial that the judgment must be reversed. As was stated in *People* v. *Bentley, supra,* 131 Cal.App.2d 687, 690: "The court struck out the objectionable statement of the officer but the damage had been done and could not have been cured by the court's admonition. The mere direction that the testimony should be disregarded was no antidote for the poison that had been injected into the minds of the jurors." Our reversal is compelled by the quoted principles of *People* v. *Lyons, supra,* 47 Cal.2d at page 318 and *People* v. *Watson, supra,* 46 Cal.2d at page 836.

In view of our decision we need not discuss the other contentions raised by defendant.

Judgment reversed.

Ford, P. J., and Allport, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied September 30, 1971.