WALLACE L. SCHIERS and EVA J. SCHIERS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Schiers v. Commissioner
Docket No. 4352-74.
United States Tax Court
T.C. Memo 1976-37; 1976 Tax Ct. Memo LEXIS 368; 35 T.C.M. (CCH) 149; T.C.M. (RIA) 760037; February 10, 1976, Filed Wallace L. Schiers, pro se. Alan R. Herson, for the respondent. RAUM
MEMORANDUM FINDINGS OF FACT AND OPINION RAUM, Judge: The Commissioner determined deficiencies in petitioners' Federal income taxes as follows: Tax Year Ended
Deficiency
December 31, 1969
$4,136.48
December 31, 1970
2,899.15
December 31, 1971
2,698.09
*369 At issue are: (1) whether petitioners are entitled to a theft loss deduction in the amount of $387,736, and (2) whether certain legal fees incurred by petitioners are deductible. FINDINGS OF FACT The parties have filed a stipulation of facts and two supplemental stipulations which, along with the exhibits attached thereto, are incorporated herein by this reference. Petitioners, husband and wife, resided in Los Angeles County, California, at the time they filed their petition. Eva J. Schiers is the third wife of Wallace L. Schiers ("petitioner"). For the years 1969, 1970 and 1971 they filed joint income tax returns. During the years 1969, 1970 and 1971, petitioner was employed by the Dow Chemical Company and his wife by Trans World Airlines, Inc. Their combined salaries or wages for these years were $24,302.87, $21,381.06 and $20,786.96, respectively. Their only other reported gross income for these years consisted of comparatively small amounts of interest received ($64.46, $185.71 and $98.81, respectively). However, petitioners reported no taxable income for any of these years because of large deductions claimed in respect of alleged theft or fraud losses sustained by Mr. *370 Schiers arising out of events connected with his having been charged with the murder of his second wife in 1957. Such deductions are the principal matters here in controversy. The amounts and theories of these claimed deductions have varied from time to time, as indicated at least in petitioners' various returns for the three tax years, which will be described more fully hereinafter. Petitioner married his second wife (Lillian R. Schiers, referred to hereinafter at times as "Mrs. Schiers") in Las Vegas in April, 1952. She had also been previously married. He was then in the United States Air Force and was stationed in California. She had formerly lived in Chicago. After their marriage she lived with petitioner in California until the end of December, 1952, when they separated. At some time, not shown in the record, petitioner was transferred to Salina, Kansas, but he and Mrs. Schiers did "get together" occasionally during their separation. He was released from the Air Force in July, 1953, when he and his wife resumed living together in California. They separated again for about two weeks around February of 1955. During the late evening of February 11, 1957, or the early morning *371 of the following day, Mrs. Schiers was brutally murdered in their home. During the course of an investigation at the Schiers' home on February 12, 1957, the police, on the basis of certain evidence, took petitioner into custody. After further interrogation and investigation, he was subsequently charged with the murder of his wife. A summary of the facts implicating petitioner in the murder may be found in People v. Schiers,19 Cal. App. 3d 102, 96 Cal. Rptr. 330, referred to hereinafter. In July, 1957, petitioner was tried and convicted of second degree murder. During the trial a prosecution witness volunteered testimony about lie detector tests which purportedly demonstrated that the petitioner lied in response to questions about the murder of his wife. The presiding judge subsequently (after the noon recess) ordered this testimony stricken from the record and instructed the jury in strong language to disregard it. Petitioner paid his attorneys legal fees totalling $9,000 and an additional $1,150 for investigators' services in connection with his defense. Alleging numerous errors, including the inadequacy of the judge's instruction as a remedy for the improper *372 lie detector testimony, petitioner appealed to the California District Court of Appeal without the assistance of counsel. In 1958, that court affirmed his conviction ( People v. Schiers,324 P. 2d 981), and a petition for hearing was denied by the Supreme Court of California. Petitioner served in prison until his release on parole in August, 1961. While incarcerated, he employed an attorney to file various motions in the state court further contesting his conviction. He paid this attorney $3,000 for his unsuccessful efforts. After being released on parole, petitioner, again without the assistance of counsel, filed a petition for a writ of habeas corpus in the United States District Court for the Southern District of California, Central Division. The petition was denied, and the denial affirmed by the United States Court of Appeals for the Ninth Circuit ( Schiers v. People of State of California,333 F. 2d 173 (C.A. 9)). Petitioner's sentence was completed in 1965. In 1971, however, pursuant to a petition filed on his behalf by a new attorney, the California District Court of Appeal ordered the remittitur recalled and the appeal reinstated *373 on the ground that during the first appeal, petitioner, an indigent person, was not furnished with counsel. The court (which was then composed of a panel of judges different from the one which originally affirmed the conviction) then decided that the trial judge's instruction was insufficient to cure the harm caused by the lie detector testimony and reversed the conviction ( People v. Schiers,19 Cal. App. 3d 102, 96 Cal. Rptr. 330), despite also concluding that "[Absent] the evidence relating to the lie detector test, we would unhesitantly hold that the evidence was sufficient to sustain the judgment". Petitioner's vigorous opposition notwithstanding, the case was dismissed on December 26, 1971, upon the district attorney's motion for dismissal "in the interests of justice". [1] Petitioner paid his attorney $2,500 in 1970 and $3,838.80 in 1971 for services rendered in connection with this successful effort to reverse his conviction. As noted above, petitioners *374 on their income tax return for 1969 reported income from wages and salaries totalling $24,302.87 and interest income of $64.46. They reported no taxable income, however, by reason of an asserted "NET LOSS CARRYOVER FROM 1968" in the amount of $69, 84.01. On their income tax return for 1970 petitioners reported income from wages and salaries totalling $21,381.06 and interest income in the amount of $185.71. On that return they claimed a theft loss deduction as follows: Item or article
Amount of loss
Cash
$187,000
Personal
30,765
Income
170,071
$387,836
less limitation
100
Total deduction
$387,736 A deduction of $2,500 for attorneys' fees was also taken by petitioners on that return. At about the same time petitioners filed a "REVISED" return for the year 1969, dated April 14, 1971, on which they deducted, in lieu of the $69,834.01 "NET LOSS CARRYOVER FROM 1968" claimed on their original return for 1969, a "CASUALTY LOSS CARRYBACK FROM 1968 (REVISED)" in the amount of $341,414.10. This amount reflected petitioners' computation of the balance of a net operating loss purportedly incurred in 1970 (as a consequence of the substantial theft loss deduction *375 claimed in that year) which had first been carried back to the year 1968. On their return for the year 1971 petitioners reported income from wages and salaries totalling $20,786.96 and interest income in the amount of $98.81. However, they claimed a "CARRYOVER LOSS FROM 1969" in the amount of $317,046.77 and a deduction for attorneys' fees of $3,838.80. Petitioners also filed amended returns for all of these years, 1969, 1970, and 1971, dated March 13, 1973. These amended returns were evidently based on the assumption that some or all of the losses claimed on the original return for 1970 were instead deductible in 1972, and that accordingly, it was in that year that a net operating loss was incurred which, in turn, petitioners were entitled to carryback to the three preceding taxable years. In his deficiency notice the Commissioner determined that the theft loss deduction on petitioners' original return filed for 1970 was not allowable since "it has not been established that any deductible loss was sustained during the year". He also disallowed the net operating loss deduction claimed on their original return for 1969, stating that "it has not been established that you sustained *376 a net operating loss in 1968 or any other year which is available as a carryover to 1969". Additionally, he determined that petitioners "did not sustain a net operating loss in the taxable year 1970 within the meaning of section 172 of the Internal Revenue Code", and "[consequently,] there is no net operating loss carryback to prior years and no net operating loss carryover to 1971". The Commissioner also disallowed deductions of $2,500 and $3,838.80 for attorney fees claimed by petitioners on their 1970 and 1971 returns, respectively, because "it has not been established that such amounts represent ordinary and necessary business expenses nor that such amounts are deductible under any other provisions of the Internal Revenue Code". Finally, with regard to the revised and amended returns filed by petitioners the notice of deficiency set forth that, "[in] making this determination of your income tax liability, careful consideration has been given to [them]". [2]
*377 Petitioner appears now to have limited himself to the theory set forth in the original 1970 return that the alleged theft losses in the aggregate amount of $387,836 occurred in 1970, and that with carrybacks and carryforwards he owes no taxes for any of the three tax years 1969-1971 here involved. As already noted above, the 1970 return shows the claimed $387,836 loss as being composed of three separate items ("Cash", $187,000; "Personal", $30,765; and "Income", $170,071). (a) Cash. The principal item of the alleged loss is a claimed theft of $187,000 in cash from petitioner's home in the afternoon of February 12, 1957, after he had been taken into custody by the police. The only testimony in support of that position was given by petitioner himself and may be summarized as follows: In April, 1952, at around the time of petitioner's marriage to his second wife or somewhat prior thereto, her former employer, an "ex-banker", entrusted to her in Chicago $250,000 in "marked" $100 bills. She brought these bills to Los Angeles shortly thereafter. Her arrangement with the ex-banker was that she was to undertake to "launder" or exchange these funds for unmarked bills, that she was *378 to receive a 20 percent commission, and that she was to remit the remaining 80 percent to the ex-banker. The evidence does not identify the ex-banker, or the banking institution with which he had been affiliated, or indeed show whether the term "banker" may merely have been a euphemism in respect of some type of activity that is not ordinarily regarded as banking in the usual sense of that word. Mrs. Schiers kept the funds in a safe deposit box in Los Angeles which she rented in her maiden name. She did not inform petitioner about these bills at that time. It was in April, 1953 (on one of the occasions when they "got together" during their first separation) that she first disclosed to him the existence of $32,000 in such bills, which he then "laundered" or "passed" for her at the gaming tables in Las Vegas. After their second separation in late February or early March of 1955, she revealed to him another $18,000 which he similarly "laundered" or "passed" in Las Vegas or "at the race track in California". In accordance with Mrs. Schiers' arrangement with the banker, 80 percent of the $50,000 which had been "laundered" up to that time was remitted to him in Chicago. It was in late October, *379 1956, that Mrs. Schiers first disclosed to petitioner the existence of the remaining $200,000. She had brought it home in a brown suitcase or satchel, and told him that the banker had died. They discussed the situation and he advised her to keep the money rather than to return it to the banker's estate since it might "embarrass" his family. She followed that advice. Many, if not most, of these marked bills were "pretty badly" discolored. Petitioner selected $13,000 of the bills that were in better condition, and by February 11, 1957, had "passed" them in Las Vegas or at the race track. At the time of Mrs. Schiers' murder on the night of February 11, or early morning of February 12, 1957, the remaining $187,000 in $100 bills were in the brown suitcase that was kept in a linen closet at the Schiers' home. The suitcase was in that closet, when at about 3:00 or 3:30 p.m., petitioner was taken into custody by three policemen and taken to the police station. Other policemen remained in the house for up to another hour. When they left, the house and windows were locked, and neighbors who allegedly were keeping "an eye" on the premises on petitioner's behalf saw no one enter the house thereafter *380 until petitioner was brought back some 10 hours later at about 1:00 a.m. the following morning. At that time petitioner noticed that the suitcase was missing. He made no formal complaint about this to any authorities, but he testified that some four months later his attorney, Jerry Giesler, now deceased, made an oral report thereof to the Chief of Police. There is no corroborating evidence of this alleged report in the record. It is petitioner's position that the $187,000 in marked $100 bills allegedly left in the brown suitcase at his house on the afternoon of February 12, 1957, was stolen somewhat later that afternoon by one or more of the policemen who were left behind when he was taken into custody. (b) Personal. The second item claimed as a theft loss on petitioner's 1970 return was in the amount of $30,765 and was described therein merely as "Personal". This item actually consisted of a number of components. To the extent that there was evidence in this record the components were as follows: [3]
(i) Attorney's fees in the aggregate amount of $9,000 paid in 1957 to petitioner's attorneys (Giesler and Eagan) who represented him at his trial, but who, in his opinion, fraudulently *381 failed to present a certain defense which in his judgment would have exculpated him. (ii) An investigator's fee of $1,150 which petitioner paid to his attorneys in 1957 to hire an investigator in connection with his trial. It is petitioner's position that, although investigations were conducted, there was no intention of getting anything out of them, and that he was therefore defrauded of that amount. (iii) Attorney's fees in the amount of $3,000 paid to another attorney (Daniel G. Marshall) in 1959 and 1960 in connection with various proceedings in the appellate courts. (iv) Petitioner's automobile in which he had an alleged $1,200 equity, and which had been left in front of his house when he was taken into custody. When he was released on bail he found that the car was gone. It had been repossessed by the person from whom he had purchased it, and to whom there was a balance of some $500 or $600 due on the purchase price. Petitioner never took any action against the person who repossessed the car. (v) An alleged loss of some $3,500 in respect of the house owned jointly or as community property by petitioner and his second wife. The house was sold in 1957 by petitioner and *382 Mrs. Schiers' daughter, and the proceeds paid to the daughter. The ground for the alleged theft loss as to this component is confusing. Petitioner does not appear to claim any loss by reason of the fact that the proceeds were paid to the daughter. Rather, pursuant to his testimony, he appears to rely upon the decline in value of the property as a consequence of the notoriety associated with it in connection with the murder and various unspecified burglaries thereafter, as well as upon the economic pressure that compelled him to enter into the sale, which he characterized as a "forced sale". (vi) A $25 check signed by petitioner and made out to cash which was in Mrs. Schiers' purse at the time of the murder and which disappeared after the police took petitioner into custody on February 12, 1957. The check was thereafter cashed. (vii) Coins in the amount of $65 in a piggy bank which disappeared after petitioner was taken into custody on February 12, 1957. (viii) Petitioner's bank account in the amount of $505 which was depleted in some manner not clearly explained. *383 (c) Income. The third item of the claimed theft loss is in the amount of $170,071, and is described as "Income" on the 1970 return. No evidence was presented as to this item, but the parties have stipulated in respect of it as follows: 8. The claimed loss of $170,071.00 represents the accumulation of income petitioner Wallace L. Schiers claims he could have earned during the period of his incarceration and years after had he not been incarcerated. During the tax years 1969-1971 petitioners had gross income, almost entirely from wages or salaries, in combined amounts varying from some $20,000 to $24,000 for each year. After having taken a number of confusing and inconsistent positions, they now claim a theft loss in the amount of $387,836 for the year 1970 which not only would wipe out all of their taxable income for that year but also, through claimed carrybacks and carryforwards, would eliminate their taxes otherwise due for 1969 and 1971. The various components of the claimed $387,836 theft loss are based largely upon events associated with the homicide of petitioner's second wife and the criminal proceedings against the petitioner. In addition to the Commissioner's disallowance *384 of the foregoing theft loss deduction, there is also in issue herein his disallowance of deductions in the amounts of $2,500 and $3,838.80 for attorney's fees in 1970 and 1971, respectively. 1. Theft losses. Petitioners' confusing positions in regard to the theft loss deduction are, in our judgment, wholly without merit, and deserve only summary treatment. In the first place, even if otherwise deductible, petitioners must establish that the claimed losses occurred in 1970. This they have not done. Not only did all of the relevant events happen a number of years prior to 1970, but there was no showing that any reasonable expectation of recouping the alleged losses expired in 1970, or, for that matter, in 1969 or 1971. See section 1.165-8(a) (2) and 1.165-1(d) (3), Income Tax Regs.
We need not attempt to make a comprehensive catalogue of the various other impediments to petitioners' position, for it is clear that they have failed to prove that Mr. Schiers sustained any deductible theft loss in any year. [4] We shall, however, briefly point out several controlling considerations. *385 In respect of the $187,00, proof of another prerequisite to the theft loss deduction was woefully lacking on the record before us. One who claims a theft or casualty loss must prove that he was the owner of the property in question. Thomas J. Draper,15 T.C. 135, cf. J. T. Lupton,19 B.T.A. 166. Petitioner's only contention in this respect is that he acquired the $187,000 from his wife, presumably at her death. Yet his own testimony strongly suggests not only that the ex-banker, who was allegedly the original source of the funds, may not have had any legitimate right thereto which he could have passed on to Mrs. Schiers, but also that the ex-banker in any event merely entrusted the money to her so that it could be laundered with the understanding that she was to have the right only to a 20 percent commission for her services. Accordingly, the record fails to establish that Mrs. Schiers ever had any rightful claim to the funds which she could, in turn, have passed on to petitioner at her death. Thus, even if petitioner were otherwise to be treated as having inherited all of his wife's property as of the time of her death -- a matter which itself *386 could be open to much controversy in the circumstances of this case [5] -- he has not established that he became the owner of the $187,000. This consideration alone is a sufficient basis for disallowing the deduction of this item. As to the so-called "personal" component of the alleged theft loss in the amount of $30,765, the record contains specific evidence of only some of the many items included in this amount. We cannot find that a deductible theft loss would be available to petitioner for any year in respect of any of the specifically identified items. Those items (in respect of which evidence was presented) consisted primarily of the following: legal fees ($9,000) and fees for investigation services ($1,150) incurred in connection with the 1957 criminal trial; legal fees ($3,000) incurred in 1959 and 1960 in *387 attempts to have his conviction reversed; loss ($3,500) on the sale of petitioner's home in 1957; loss ($1,200) on the repossession of his car in 1957; and loss ( $505) in respect of the balance in his checking account. [6] Petitioner bases his claim that all of these so-called losses were theft losses directly or indirectly on the performance of his attorneys during the course of his trial for the murder of Mrs. Schiers. He alleges that the attorneys misled him by representing that certain evidence he believed was helpful to his defense would be offered into evidence, but then failed to see that it was, and that, moreover, in all, they conducted a defense so detrimental to his interests that exacting fees for such services constituted fraud or theft. As to the other related expenses and losses he argues that they were suffered as a consequence of his being convicted of murdering his wife. Since, in his view, that would not have occurred but for the fraud or theft perpetrated by his attorneys, those losses and expenses also constitute theft losses. *388 We have reviewed the transcript of petitioner's criminal trial (including the transcript of the closing arguments), which was the only evidence offered to corroborate his testimony in this regard. Although we are not prepared to conclude that the efforts of his attorneys were free from error, we find no support for petitioner's allegation of intentional acts by his attorneys sufficient to warrant a finding that they obtained their fees by false pretenses, an act constituting theft under California law. [7]Cal. Penal Code (West 1970), sec. 484; cf. Michele Monteleone,34 T.C. 688. Indeed, it appears, quite to the contrary, that petitioner's attorneys vigorously attempted to successfully defend him. Petitioners have thus failed to establish that any part of the $30,765 consisted of deductible losses resulting from theft. Finally, in respect of the third component of the theft loss deduction in controversy *389 -- the $170,071 representing the income petitioner contends he could have earned during the term he served in prison and years after had he not in fact been incarcerated -- we need not speculate as to the theory on which petitioner predicates his characterization of this amount as a theft loss. It is well settled that the failure to realize anticipated income does not give rise to a loss within the meaning of section 165 of the Code. Hort v. Commissioner,313 U.S. 28, 32-33; Marks v. Commissioner,390 F. 2d 598 (C.A. 9), affirming a Memorandum Opinion of this Court, certiorari denied, 393 U.S. 883; cf. 5 Mertens, Law of Federal Income Taxation, sec. 28.12. 2. Legal Fees in 1970 and 1971. In an effort to have his murder conviction reversed petitioner incurred legal fees of $2,500 and $3,838.80 in 1970 and 1971, respectively. He contends that these expenses are deductible because they were incurred in the hope that a retrial following a reversal of his conviction would disclose facts that might eventually lead to the recovery of the $187,000 in cash purportedly stolen by the police. We must reject this contention. Not only *390 has petitioner failed to establish the factual basis underlying this claim, i.e., the connection between the purported $187,000 theft loss and the reversal of his conviction, he also misconstrues its import. The deductibility of legal fees must be determined by reference to the origin of the dispute out of which they arose and not the consequences an unfavorable resolution of that dispute might have had on other interests of the taxpayer. United States v. Gilmore,372 U.S. 39. Plainly, the petitioner's legal fees arose not out of the theft of any of his property (cf. Katherine Ander,47 T.C. 592) but out of his conviction for the murder of his second wife. Therefore, they are nondeductible personal expenses. Nadiak v. Commissioner,356 F. 2d 911 (C.A. 2), affirming a Memorandum Opinion of this Court. Decision will be entered for the respondent.
Footnotes
1. There did not appear to be any explanation of the words "in the interests of justice", such as perhaps the fact that petitioner had already fully served the term for which he had been sentenced.↩
2. The Commissioner also disallowed the deduction claimed on petitioners' 1971 return for the payment of a penalty in the amount of $36.46 imposed on them for failing to timely pay their 1965 Federal income tax. Petitioners have not challenged this disallowance and, accordingly, must be treated as having conceded the correctness thereof.↩
3. As to the claimed loss of $30,765, the parties have stipulated as follows: 6. The claimed personal losses consisted of $14,765.00 claimed to have been paid to various attorneys, investigators, witnesses and miscellaneous costs associated with a 1957 criminal trial wherein petitioner Wallace L. Schiers was the defendant charged with murder and which resulted in his conviction and subsequent imprisonment. The balance of $16,000.00 represented claimed losses from the claimed forced sale of a home; the claimed loss of miscellaneous personal property consisting of automobiles, household furnishings, tools, clothing and small cash sums of money; the claimed inheritance loss of claimed income property, claimed proceeds from insurance policies, and various sums of money claimed to have been held in checking and savings accounts, all of which were claimed to have been incurred as a result of the murder charge, the trial and the conviction and imprisonment in 1957. However, evidence was presented only in respect of the components listed in the text above. Petitioners' brief contains references to various other alleged components some of which were undoubtedly comprehended generally within the foregoing stipulation but which were not otherwise clarified by the evidence in the record. The components in respect of which there is evidence do not add up to the total of $30,765 claimed by petitioners.↩
4. Petitioner has made the point that in a case that was before this Court in 1970 the Court ruled that the claimed theft losses were deductible. No such ruling was made by this Court. It appears that on petitioner's 1965 return he claimed a deductible loss in respect of some $87,000 of income that he believed he would have received if the allegedly stolen $187,000 in cash had been invested. Apparently, the Commissioner had disallowed that deduction, and the taxpayer filed a petition with this Court. However, that case was never tried, and pursuant to a stipulation of settlement, a judgment was entered against the petitioner setting forth a deficiency for 1965 in an agreed amount. The files of this Court disclose no other action or ruling made by the Court. Obviously, there was no "ruling" by this Court that the amounts involved in this case are deductible.↩
5. Even if she owned the funds, certain problems would have to be faced. The evidence indicates that she left no will, and what her husband's rights might be in respect of her property through intestacy would have to be determined, inter alia, in the light of the fact that she had at least one surviving child. We do not pause to mention other possible difficulties.↩
6. In addition to the foregoing items were $65 in coins in a piggy bank and a $25 check made out to cash by petitioner which was in Mrs. Schiers' purse at the time of her death. The evidence does not show that these items belonged to petitioner at that time. However, even if they could be considered as owned by him, they would together amount to less than $100 and would thus not furnish the basis for a theft deduction standing by themselves. See section 165(c) (3), I.R.C. 1954↩.
7. Moreover, a number of the items hardly qualify as theft losses for other reasons. For example, the repossession of petitioner's automobile by the vendor or the sale of petitioner's house could not be treated as events resulting in theft losses on any theory.↩